**Margaret Kelly MICHAELS, Plaintiff,**

v.

**State of NEW JERSEY, Attorney General's Office, County of Essex, Essex County Prosecutor's Office, George L. Schneider, Esq., Herbert Tate, Esq., John Mastroangelo, John Noonan, Glenn Goldberg, Esq., Sarah Spencer–McArdle, Eileen C. Treacy, M.A., Essex County Police Department, Newark Police Department, Division of Youth and Family Services, Louis Fonnelaras, Susan Esquillan, [ ], Defendants.**

### No. Civ.A. 96–3557(MTB).

United States District Court, D. New Jersey.

May 26, 1999.

Louis J. Santore, Santore & Kenny, Secaucus, New Jersey, for plaintiff.

Paul E. Stevenson, Deputy Atty. Gen., Division of Law, Newark, New Jersey, for defendants State of New Jersey; Attorney General's Office; Division of Youth and Family Services; and Louis Fonnelaras.

Michael R. Griffinger, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, New Jersey, for defendant County of Essex.

David N. Samson, and Gage Andretta, Wolff & Samson, Roseland, New Jersey, for defendants Essex County Prosecutor; George L. Schneider, Herbert Tate, Glenn Goldberg, and Sarah Sencer–McArdle.

Steven C. Mannion, Asst. County Counsel, Catherine E. Tamasik, Essex County Counsel Hall of Records, Newark, New Jersey, for defendants Herbert Tate, George L. Schneider, Richard Mastroangelo; Glenn Goldberg, Sarah Sencer–McArdle.

Jacqueline A. DeGregorio Deputy Attorney General, Weiner Lesniak, Lincoln Centre, Parsippany, New Jersey, Defendants Glenn Goldberg, Sarah Spencer-McArdle.

John R. Gonzo, Harwood Lloyd, Hackensack, New Jersey, for defendant Eileen C. Treacy.

Steven C. Mannion, Asst. Corp. Counsel, Michelle Hollar–Gregory, Corporation Counsel, Newark, New Jersey, for defendant Newark Police Department.

Philip L. Geibel, Stevens & Minter, Secaucus, New Jersey, for defendant Susan Esquillan.

## OPINION

BARRY, District Judge.

Assistant prosecutor Sara Sencer–McArdle (improperly pled as "Sara Spencer–McArdle") ("Sencer–McArdle"), Essex County Prosecutor's Office ("ECPO") investigators George McGrath ("McGrath") and Richard Mastroangelo ("Mastroangelo") (collectively the "county investigators"), and Division of Youth and Family Services investigator Louis Fonolleras ("Fonolleras"), all move for summary judgment on the complaint of plaintiff Margaret Kelly Michaels ("Michaels") on the ground of absolute or qualified immunity. Defendant and third party plaintiff psychologist Susan Esquilin (improperly pled as "Susan Esquillan") ("Esquilin"), also moves to dismiss Michaels' complaint for failure to state a claim.[1] The court has reviewed the submissions of the parties without oral argument pursuant to Fed. R.Civ.P. 78. For the reasons discussed below, each of the defendants' motions will be granted.

### I.

The facts of this case are, by now, well known. Michaels, after being convicted of numerous counts of child sexual abuse, spent five years in prison before being released when the Appellate Division reversed her conviction and remanded for a retrial. The Supreme Court affirmed, but the charges against Michaels were subsequently dismissed. She comes before this court seeking damages for being subjected to an allegedly unconstitutional investigation at the hands of defendants. This court will not attempt to recap every nuance of the case's history, and that history is well documented in the various opinions which have preceded this opinion.[2] Only what is relevant to the pending motions will be restated.

On April 26, 1985, upon being examined by his pediatrician, one of the children (M.P.) for whom Michaels cared at the Wee Care Nursery in Maplewood, New Jersey, made an allegation of sexual abuse against her. Four days later, that allegation was referred to the Institutional Abuse Investigation Unit of the Division of Youth and Family Services ("DYFS"). Schiripo Cert., Exh. A, Fonolleras Dep. I at 71. Fonolleras, the investigator assigned to the DYFS investigation, contacted ECPO investigator Mastrangelo on May 1, 1985, as required by law, and Mastrangelo brought the matter to the attention of Sencer–McArdle, the director of the Child Abuse Unit of the ECPO. Sencer–McArdle Cert. ¶ 5.

Within a few days, four more children (E.N., S.R., C.C. and M.R.) came forward with allegations of abuse at the hands of Michaels. Id. ¶ 6. Sencer–McArdle interviewed all five children, in early May, after each child was initially interviewed by a county investigator. Id. ¶ 6–8. Esquilin, after being contacted by either the ECPO or DYFS by virtue of her position at United Hospital, conducted one interview and attended another. Esquilin Dep. at 61–63.

---

1. Third party defendant Health Care Insurance Company ("HCIC") moves to dismiss Esquilin's claim against it for indemnification, should Esquilin prevail on her motion to dismiss. See HCIC Letter, September 9, 1998. Esquilin opposes this request. See Esquilin Letter, September 17, 1998.

2. See e.g., State v. Michaels, 136 N.J. 299, 642 A.2d 1372 (1994); State v. Michaels, 264 N.J.Super. 579, 625 A.2d 489 (App.Div.1993).

Fonolleras and others conducted several more interviews of the children. Fonolleras Dep. at 87. On May 6, 1985, Michaels took a polygraph examination, the results of which were inconclusive.

Sencer–McArdle convened a grand jury on May 24, 1985 based on the allegations of three of the five children she interviewed (M.P., S.R. and C.C.). Sencer–McArdle Cert. ¶ 9. On June 6, 1985, the first of three indictments against Michaels was returned. *Id.* ¶ 8. Michaels was arrested at her East Orange apartment on June 12, 1985. Mannion Cert., Exh. A, McGrath Dep. II at 87.

Subsequent to the first indictment, the county investigators were notified by DYFS that there were other children claiming to have been sexually abused by Michaels. Sencer–McArdle Cert. ¶ 10. Interviews of these children by the county investigators followed, but Sencer–McArdle did not participate. *Id.* Instead, Sencer–McArdle interviewed parents and teachers, reviewed transcripts the county investigators had made of their interviews with the children (*id.*), and advised the investigators as to how to handle the interviews. Santore Cert., Exh. H, Noonan Dep. at 29–31. When Sencer–McArdle thereafter decided to present the newly gathered information to a second grand jury, she interviewed the latest group of children. A one hundred and seventy four count indictment involving approximately twenty children was returned by the second grand jury on July 30, 1985. Sencer–McArdle Cert. ¶ 11.

After the second indictment was returned, the ECPO was contacted regarding additional allegations of abuse of yet other children, and those children were interviewed by the investigators. *Id.* After those initial interviews, Sencer–McArdle interviewed the children in preparation for a third grand jury, which returned the final fifty-five count indictment against Michaels on November 21, 1985. *Id.*

Trial against Michaels commenced on June 22, 1987 in the Superior Court of New Jersey on the one hundred and sixty-three counts returned by the three grand juries.[3] Assistant prosecutors Sencer–McArdle and Glenn Goldberg led the prosecution. Esquilin and Fonolleras both testified for the prosecution at the trial.

In April of 1988, Michaels was convicted of 115 counts of aggravated sexual assault, sexual assault, endangering the welfare of children, and terroristic threats. *See Michaels*, 136 N.J. at 305–06, 642 A.2d 1372. The Appellate Division reversed the convictions on March 26, 1993, and remanded for a new trial. *See Michaels*, 264 N.J.Super. at 629–32, 625 A.2d 489. The Appellate Division directed that a pretrial hearing would be required to ascertain the reliability of the children's statements and testimony should the prosecution decide to retry the case (*id.* at 631–32, 625 A.2d 489), and the Supreme Court of New Jersey agreed. *See Michaels*, 136 N.J. at 324, 642 A.2d 1372 (agreeing with the Appellate Division on the need for a taint hearing, stating that "the interrogations ... were improper and there is a substantial likelihood that the evidence derived from them is unreliable"). On December 1, 1994, the ECPO formally dismissed all criminal charges against Michaels. Compl., First Count, ¶ 25.

On June 13, 1996, Michaels filed a six-count complaint against a multitude of defendants in the Superior Court of New Jersey, Law Division, Essex County. Defendants removed the case to this court on July 25, 1996. All that remains of the complaint, however, are Michaels' malicious prosecution and Section 1983 claims against Sencer–McArdle, McGrath, Mastrangelo, Fonolleras and Esquilin.[4] Discovery on the issue of immunity having

---

3. Seventy-two of the original counts were dismissed by the ECPO.

4. In her complaint and amended complaint, Michaels asserted claims for malicious prosecution (Count One), intentional infliction of emotional distress (Count Two), negligent training and supervision (Count Three), violation of 42 U.S.C. § 1983 (Count Four), abuse of process (Count Five), and negligent and

concluded, these defendants now move for dismissal of the claims against them.

## II.

### A. Summary Judgment Standard

Summary judgment may be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When ruling on a motion for summary judgment, all facts and reasonable inferences drawn from the evidence are viewed in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party has the initial burden of pointing out the absence of a genuine issue as to any material fact, but summary judgment is only granted against a party who fails to demonstrate "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### B. Michaels' Claim under 42 U.S.C. § 1983

In support of her claim pursuant to 42 U.S.C. § 1983, Michaels alleges that each defendant violated her Fourteenth Amendment rights in conducting the investigation.[5] Specifically, Michaels contends that the defendants: one, improperly suggested false allegations to the children and thereby destroyed their capacity to remember or recall; two, brainwashed the children with the aforementioned false suggestions; three, distorted the children's memories with suggestive and leading questions; four, used selective reinforcement via threats, coercion and bribes; five, failed to record interviews with the children and destroyed or intentionally lost tapes of interviews; and six, used gross and egregious interrogation techniques which included threatening and suggestive methods, in addition to coaching the children as to their interviews prior to taping. Amended Compl., ¶ 27(a)–(f).[6]

A Section 1983 claim must be based on an alleged constitutional, or federal statutory, violation.[7] If a defendant enjoys either absolute or qualified immunity, however, the action should be dismissed at the outset. Immunity is not simply a means of avoiding trial but, rather, a method of preventing a party from having to be subjected to litigation at all. *See Orsatti v. New Jersey State Police*, 71 F.3d 480, 483

---

malicious prosecutorial misconduct (Count Six). On November 8, 1996, this court dismissed the Second, Third, Fifth, and Sixth Counts of Michaels' complaint on the ground that the statute of limitations had run and because there had been noncompliance with the limitations and notice provisions of the New Jersey Tort Claims Act, *see Michaels v. State of N.J.*, 955 F.Supp. 315 (D.N.J.1996), leaving only her common law malicious prosecution and Section 1983 claims and the County's crossclaims. On June 30, 1997, this court dismissed Michaels' claims against the County of Essex. By stipulation, the complaint was dismissed against the State of New Jersey, the New Jersey Attorney General's Office and DYFS. Subsequently, stipulations of the dismissal of claims against Eileen C. Treacy, Glenn D. Goldberg, George Schneider and John Noonan were filed.

5. The failure to train and supervise aspect of Michaels' § 1983 claim is no longer before

the court as the defendants who would arguably be implicated in that conduct have already been dismissed.

6. For clarity, the court will reference these allegations under the umbrella of "improper interrogation techniques."

7. Section 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

(3d Cir.1995). If at all possible, therefrom, immunity issues should be resolved by the court at an early stage, as a matter of law. *See Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

### 1. Absolute Immunity

■ Absolute immunity exists for those officers who perform judicial or quasi-judicial functions. *See Imbler v. Pachtman,* 424 U.S. 409, 420, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Prosecutors are absolutely immune from liability under § 1983 for their conduct in "initiating a prosecution and presenting the State's case" insofar as that conduct is "intimately associated with the judicial phase of the criminal process." *See id.* at 430–431, 96 S.Ct. 984. Other officers, such as investigators, enjoy qualified immunity for their discretionary functions. *See Malley v. Briggs,* 475 U.S. 335, 340, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Whether an actor enjoys absolute or qualified immunity is based on the function he or she performs, not the title he or she holds. *See Jean v. Collins,* 155 F.3d 701, 707 (4th Cir.1998) ("[I]mmunity is tied to the nature of the function performed and not to the identity of the defendant performing that function [ ]"), *cert. petition filed,* 67 USLW 3409 (Dec. 16, 1998). In this case, the only remaining defendant eligible for absolute immunity is assistant prosecutor Sencer–McArdle, as none of the others performed any judicial or quasi-judicial functions.

■ A prosecutor generally enjoys absolute immunity for his or her quasi-judicial functions, or, to put it another way, when he or she is acting as an advocate for the state. Examples of such functions include: deciding whether or not to seek an indictment based on evidence gathered by law enforcement officers, *see Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); preparing for grand jury or trial proceedings, *see Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); and presenting evidence at a probable cause hearing. *See Burns v. Reed,* 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). A prosecutor does not enjoy absolute immunity, however, for functions deemed investigative in nature, such as the rendering of legal advice to the police or the fabrication of evidence during the investigative stage of a case. *See id.* at 496, 111 S.Ct. 1934; *Buckley,* 509 U.S. at 274–76, 113 S.Ct. 2606.

■ Most of Sencer–McArdle's actions clearly fall within the ambit of quasi-judicial functions. When, for example, Sencer–McArdle decided to seek an indictment against Michaels, she was acting as an advocate for the state. *See Buckley,* 509 U.S. at 273, 113 S.Ct. 2606; *Kulwicki v. Dawson,* 969 F.2d 1454, 1463–64 (3d Cir. 1992) ("The decision to initiate a prosecution is at the core of a prosecutor's judicial role. A prosecutor is absolutely immune when making this decision, even where he acts without a good faith belief that any wrongdoing has occurred.") (citations omitted). Furthermore, Sencer–McArdle enjoys absolute immunity for all of her activities in preparation for the grand jury proceedings and the actual trial, including witness preparation. This includes her decision to use and rely on Dr. Treacy, the expert witness, at trial. *See* Compl., Count Two, ¶ 28. It also encompasses her reliance on evidence subsequently deemed unreliable by the Supreme Court of New Jersey. *See Imbler,* 424 U.S. at 431, 96 S.Ct. 984 (holding that prosecutor enjoys absolute immunity "in initiating a prosecution and presenting the State's case" even if prosecutor knowingly submitted false evidence at trial).

■ Not all of Sencer–McArdle's actions, however, are so clearly quasi-judicial, and this court must look carefully to determine if and when she was acting in an investigative capacity, with only qualified immunity available for those activities. The line between quasi-judicial and investigative activities is concededly nebulous, and courts look to several factors. *See id.,* 424 U.S. at 431 n. 33, 96 S.Ct. 984; *Kulwicki,* 969 F.2d at 1465. One of the ways by which to determine on which side of the

line the actions in question fall is by determining when probable cause existed for, as the Supreme Court has held, prior to the establishment of probable cause to arrest, the prosecutor cannot be deemed an advocate for the state. *See Buckley,* 509 U.S. at 274, 113 S.Ct. 2606 ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."). At issue here, therefore, are Sencer–McArdle's activities which predated her decision to seek an arrest and/or an indictment of Michaels, specifically: one, the interviews she conducted in early May of 1985 of the first five children; and, two, the legal advice she rendered to the investigators.

■ With respect to the interviews of the five children, Sencer–McArdle offers two conflicting conclusions as to whether probable cause then existed. In her certification to this court, Sencer–McArdle stated that those interviews were conducted to ascertain whether probable cause existed. *See* Sencer–McArdle Cert. ¶ 4, 6. However, one month later, on September 16, 1998, Sencer–McArdle stated, at her deposition, that probable cause already existed to arrest Michaels at the time of the interviews. *See* Sencer–McArdle Reply Brief, Exh. A, Sencer–McArdle Dep. at 32. Sencer–McArdle contends that she was always acting as an advocate. *See* Sencer–McArdle Cert. ¶ 12.

Although it is Sencer–McArdle's prerogative to attach whatever label she wishes to her conduct, it is this court's obligation to scrutinize that conduct to determine what hat she wore during those early days of the investigation.[8] Interviews conducted to establish whether or not probable cause exists are investigative, rather than quasi-judicial, and that is what these early interviews appear to be. *See Buckley,* 509 U.S. at 273, 113 S.Ct. 2606 ("There is a difference between the advocate's role in

evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand.").

The time frame here belies Sencer–McArdle's assertion that these early interviews were not investigatory. As is discussed more fully above, Sencer–McArdle was made aware of the first allegation of abuse on May 1, 1985. She interviewed the first child within days and the next four children shortly thereafter. Michaels took a polygraph examination on May 6th. A grand jury was convened on May 24th and returned the indictment on June 6th. Michaels was arrested six days later.

It is highly unlikely that probable cause to arrest Michaels existed on the same day on which the ECPO was first made aware of the very first unsubstantiated allegation, or that Sencer–McArdle's interviews of the first five children almost immediately thereafter were in preparation for the grand jury presentation. *See* Sencer–McArdle Dep. at 17–18. Certainly, the inconclusive results of the polygraph from that same first week of May must have given Sencer–McArdle some pause. It is also unlikely in the extreme that the ECPO would have waited until June 12th to arrest Michaels if probable cause existed to arrest her on May 1st or thereabouts when at least arguably the safety of young children was at risk. *See Buckley,* 509 U.S. at 275, 113 S.Ct. 2606 (prosecutor's assertion that probable cause existed during allegedly investigatory phase was undermined by fact that suspect was arrested well after grand jury was impaneled).

Moreover, a prosecutor cannot, as Sencer–McArdle attempts to do here, invoke a later grand jury proceeding to retroactive-

---

**8.** While the immunity analysis on a motion for summary judgment does not vary significantly from the analysis of any other issue on summary judgment, the court is permitted to make a limited factual inquiry to resolve the defendant's role, if necessary. *See Forsyth v. Kleindienst,* 599 F.2d 1203, 1215 (3d Cir. 1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981).

ly recharacterize investigative activities as quasi-judicial. *See Buckley,* 509 U.S. at 276, 113 S.Ct. 2606 ("A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial.").

Early in May, after being apprised of the first allegation against Michaels from DYFS, Sencer–McArdle was acting in an investigative capacity. No matter what label Sencer–McArdle puts on the five initial interviews (Sencer–McArdle Cert. ¶ 7), it is abundantly clear to this court that they were investigatory in nature. When a prosecutor functions as an investigator he or she only enjoys the immunity of the investigator. *See Buckley,* 509 U.S. at 276, 113 S.Ct. 2606.

Sencer–McArdle also gave legal advice to the investigators on the Michaels' case. *See* Santore Cert., Exh. H, Noonan Dep. at 29–31. Under *Burns,* absolute immunity is unavailable to Sencer–McArdle for that activity. *See Burns,* 500 U.S. at 495, 111 S.Ct. 1934 (holding that it would be "incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice").

Thus, prior to the decision to seek an indictment, Sencer–McArdle was functioning as an investigator or engaging in investigative activities, conduct not protected by absolute immunity. *Cf. Hill v. City of New York,* 45 F.3d 653, 662–63 (2d Cir. 1995) (stating that where prosecutor participated in videotaped interview of suspect, "if the videotapes were made to collect or corroborate evidence against Hill in

order to get probable cause to arrest her, the act of making the tapes receives only qualified immunity"). Once Sencer–McArdle made the decision to seek an indictment and began to function as an advocate for the state by preparing for the grand jury and then for trial, however, she enjoys absolute immunity, and there can be no recovery by Michaels for those activities.

### 2. Qualified Immunity

Defendants [9] claim that Michaels cannot recover against them because they are immune from suit by virtue of the doctrine of qualified immunity. Michaels disagrees. Like absolute immunity, qualified immunity is a threshold issue that may be decided by the court at the outset of litigation. *See Orsatti,* 71 F.3d at 483 ("When the material facts are not in dispute, the district court may decide whether a government official is shielded by qualified immunity as a matter of law.") (citing to *Anderson v. Creighton,* 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

██ Qualified immunity is available to government officials, such as law enforcement officers, performing discretionary functions. *See Harlow v. Fitzgerald,* 457 U.S. 800, 816, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The immunity extends, moreover, to those who are working at the officers' behest, if the nature of the function performed is the same. *See Kerr v. Lyford,* 171 F.3d 330 (5th Cir.1999) (applying qualified immunity analysis to Department of Human Services case workers who participated in murder investigation). The actions of the five defendants before the court on these motions—the sole remaining defendants—that contributed to what Michaels claims to be the constitutional violation—improper interrogation tech-

---

9. The remaining five defendants will be collectively referred to as "defendants" for purposes of the qualified immunity analysis. The court is aware that defendant Esquilin is moving to dismiss for failure to state a claim. Dispositive motions, however, were to be filed

on the issue of immunity only. *See* Scheduling Order, December 8, 1997, ¶ 3. For that reason, and because Esquilin comes within the purview of qualified immunity, the court will assume that she has joined in the other defendants' motions.

niques—will be analyzed, therefore, within the qualified immunity framework, as both Esquilin and Fonolleras appear to have been assisting the county investigators (McGrath and Mastrangelo) and Sencer–McArdle with the interviews.[10]

 To be stripped of qualified immunity, and thus be subjected to potential liability pursuant to Section 1983, a defendant must have "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. Once a defendant raises the defense of qualified immunity, it is the plaintiff's burden to delineate the constitutional right that was violated and show that it was clearly established at the time of the conduct at issue. *See Morales v. Busbee*, 972 F.Supp. 254, 260 (D.N.J.1997), *appeal dismissed*, 156 F.3d 1225 (3d Cir. 1998). Even if plaintiff satisfies that burden, however, it must be still be shown that an objective and reasonable officer—for the analysis does not concentrate on the subjective intent of the officer—would have acted otherwise. *See Orsatti*, 71 F.3d at 483 (noting that "the Supreme Court has recognized that it is inevitable that law enforcement officers will in some cases reasonably but mistakenly conclude that probable cause to make an arrest is present"). Finally, the court must assess

the law and the officer's actions at the time the violation occurred. *See Hunter*, 502 U.S. at 228, 112 S.Ct. 534 ("[T]he court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.").

Before the court delves into the state of the law in 1985, it must first decide whether a constitutional violation has been alleged at all. *See Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Miller v. City of Philadelphia*, 174 F.3d 368, 373 (3d Cir.1999) ("The proper approach, however, is to ascertain whether a constitutional violation has been alleged before determining if qualified immunity is available.").

Michaels claims that defendants violated her Fourteenth Amendment rights [11] by engaging in a "wholly improper investigation." Compl., Count Four, ¶¶ 6, 8.[12] No factual dispute exists over the type of interrogation and investigatory procedures employed by the defendants although defendants do not concede that those procedures were improper.[13] For purposes of a summary judgment motion, of course, this court must draw all inferences in favor of the non-movant. Thus, accepting Mi-

---

10. As noted earlier, Esquilin was initially contacted through her employer, United Hospital, to conduct interviews. Fonolleras was, at the outset, heading the DYFS investigation which pertained to Wee Care's licensing, an investigation which was not criminal in nature. *See* Schiripo Cert., Exh. B, Fonolleras Dep. at 10, 31. Later, Fonolleras became directly involved in the ECPO's investigation. *See id.*, Exh A, Fonolleras Dep. at 100–01.

11. Michaels alleges that defendants deprived her of:

the right of plaintiff not to be deprived of Life, Liberty, or Property without due process of Law, and the right to the equal protection of the laws, secured by the Fourteenth Amendment to the Constitution of the United States.

Compl., Count Four, ¶ 8.

12. Specifically, Michaels alleges that:

Defendants' acts were either for the intentional purpose of violating Plaintiff's rights, with a conscious disregard or a reckless disregard towards such rights, and were allegedly pursuant to governmental policies of the State and County regarding the handling of child abuse cases in a manner which disregarded the rights of the putative defendant and maximized public exposure and publicity, especially as those policies were applied to Plaintiff.

Compl., Count Four, ¶ 4.

13. Both the Appellate Division and the Supreme Court of New Jersey detailed the factual aspects of the various interviews and techniques used. *See Michaels*, 264 N.J.Super. at 621, 625 A.2d 489; *Michaels*, 136 N.J. at 314–15, 642 A.2d 1372, Appendix. Because the facts are uncontested, this court will not delve into the specific question-and-answer sessions.

chaels' allegations as true, the inquiry becomes whether the improper interrogation techniques that were employed violated Michaels' constitutional rights.

An improper investigation yielding unreliable evidence has its own remedy in the criminal justice system: suppression of the evidence at trial or reversal of a conviction based on the unreliable evidence. *See Kulwicki,* 969 F.2d at 1464 ("Harm to a falsely-charged defendant is remedied by safeguards built into the judicial system—probable cause hearings, dismissal of the charges—and into the state codes of professional responsibility.") (citing *Burns,* 111 S.Ct. at 1939, 1942). Having failed to convince the trial judge that remedy was required because improper interrogation techniques which led to unreliable evidence had been used, Michaels utilized the appellate process. Slow as that process may have seemed to her, it was the appropriate method by which to challenge those techniques and that evidence. Whether the improper interrogations rose to the level of a constitutional violation is a very different matter, and this court finds that they did not.

■ The interrogation techniques, standing alone, could not have violated Michaels' constitutional rights, but only, perhaps, the rights of the child being interviewed. *See Buckley v. Fitzsimmons,* 20 F.3d 789, 794–95 (7th Cir.1994), *cert. denied,* 513 U.S. 1085, 115 S.Ct. 740, 130 L.Ed.2d 642 (1995). When the child's testimony was introduced at *trial,* however, Michaels' due process rights were implicated. *See id.* Michaels, of course, may not sue for a due process violation based on testimony introduced at trial because, as discussed above, absolute immunity shields that act. *See id.* at 795 (*"Obtaining* the [coerced] confession is not covered by immunity but does not violate any of [plaintiff's] rights; *using* the confession could violate [plaintiff's] rights but would be covered by absolute immunity.") (emphasis in original). *See also Buckley,* 20 F.3d at 796 ("A person aggrieved by proposed [ ] testimony may ask the judge to exclude it, and

may appeal from an adverse judgment, but may not collect damages from the lawyers who recruited the witness.").

Even assuming, however, that improper interrogation techniques, standing alone, could state a constitutional violation and further assuming that defendants violated a constitutional right of Michaels, it does not automatically follow that that right was clearly established at the time of the violation, or that the interrogation techniques at issue were unreasonable in light of what was then known.

Parenthetically, in a qualified immunity analysis, defining the constitutional right at issue is critical in assessing whether or not that right was clearly established. *See Anderson,* 483 U.S. at 639, 107 S.Ct. 3034 (noting that this part of the qualified immunity analysis "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified"). Indeed, qualified immunity would be a worthless defense if a plaintiff could simply invoke a broad constitutional right—as here, "due process"—that a defendant supposedly violated to overcome the hurdle. *See id.; Myers v. Morris,* 810 F.2d 1437, 1459 n. 16 (8th Cir.1987) ("Qualified immunity would be meaningless if it could be defeated merely by the recitation of some well-recognized right and a conclusory allegation that the defendant infringed it."), *cert. denied,* 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987).

Even though Michaels has stated the supposed constitutional right in the broadest possible fashion, a case startlingly similar to the case at hand puts meat on those bare bones. *See Myers,* 810 F.2d at 1437. In *Myers,* fifteen arrestees (including parents of the alleged victims) were charged with child sexual abuse. *See id.* at 1440–41. After the first two arrestees were tried and acquitted, all pending charges against the others were dismissed. *See id.* The arrestees subsequently filed Section 1983 actions contending that:

[t]he prosecutor, sheriff's deputies, as well as guardians, therapists and a

court-appointed attorney are alleged to have interrogated children for an improper purpose (conspiring to elicit fabricated accusations against the plaintiffs) and in an improper manner (using methods so flawed that they inevitably produced false and fabricated accusations).

*Id.* at 1444. An appeal was taken after the trial court denied certain summary judgment motions and granted others. The Court of Appeals for the Eighth Circuit held that all the defendants were entitled to qualified immunity.[14]

■ In its analysis of qualified immunity with respect to the deputy sheriffs' interrogation of the alleged child victims, the court stated:

We examine the specific interrogation conduct identified in the record to determine whether it so exceeded accepted legal norms for the questioning of witnesses and victims that the interrogating detectives knew or should have known their conduct would violate the rights of accused persons. We do not think it sufficient for purposes of this inquiry to determine only whether fourth, fifth, sixth and fourteenth amendment rights were clearly established in 1984. *Our inquiry is whether from a 1984 perspective the law was clearly established that the conduct in which the deputies engaged would violate such rights.*

*Myers,* 810 F.2d at 1458–59 (emphasis added). This court agrees and will engage in the same form of analysis, i.e. in 1985, did defendants' interrogation techniques violate "constitutional standards protecting accused persons from suggestive or coercive interrogation of witnesses and victims." *Id.* at 1459.

■ In the mid 1980s, child abuse prosecutions had risen dramatically yet little was known about procedures regarding

interviews of alleged victims. *See* John E.B. Myers, *Taint Hearings for Child Witnesses? A Step in the Wrong Direction,* 46 Baylor L.Rev. 873, 878 (1994). The ECPO did not have a manual or set of instructions as to how to adequately interview children. *See* Def. Sencer–McArdle Reply Br., Exh. F, Laurino Cert. ¶ 2; Exh. E, Sencer–McArdle Supp.Cert. ¶ 3. The defendants in the *Myers* prosecution, which took place shortly before the Michaels prosecution, acted in a similar fashion to the defendants here when interviewing the child abuse victims. After recognizing and discussing the fact that the "unique reluctance" of victims of child sexual abuse to acknowledge that sexual abuse has occurred is at least in part responsible for the uncertainty surrounding acceptable investigative techniques, the *Myers* court concluded, in 1987, as follows:

We conclude that the interviewing conduct occurred in a grey area of investigative procedure as to which there were, and probably still are, less than clearly established legal norms. The grey area referred to involves the extent to which juvenile suspected sexual abuse victims may reasonably be questioned, particularly if they initially deny abuse, and the extent to which leading questions, confrontation with reports by others and photographs of suspects may be used.... We do not consider the standards for the interrogation of juvenile witnesses and victims, particularly in the area of sexual abuse, so clearly established in 1984 that on the basis of hindsight the deputies should now be forced to defend their questioning techniques in these damages suits.

*Myers,* 810 F.2d at 1461. This court agrees.

Unfortunately for Michaels herself, the *Michaels* case inspired a change in the

14. *Myers* was abrogated in part by *Burns,* in which the Supreme Court held that a prosecutor was not entitled to absolute immunity for rendering legal advice to police officers. *See Burns v. Reed,* 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). With respect to the qualified immunity analysis, however, the section of the opinion relevant here, *Myers* remains good law.

law. *See* Karol L. Ross, *State v. Michaels: A New Jersey Supreme Court Ruling With National Implications,* 78 MICH.B.J. 32, 32 (1999) ("*Michaels* is one of the first cases that attempts to resolve the issue of the reliability of testimony of the alleged child abuse victim, thus *filling an important void.*") (emphasis added). Indeed, the Supreme Court of New Jersey, in affirming the reversal and requirement for a taint hearing six years after the conviction, noted that:

> Our decision today should make clear that the investigatory techniques employed by the prosecution in this case are unacceptable and that prudent prosecutors and investigatory agencies will modify their investigatory practices to avoid those kinds of errors and to conform to those standards that are *now accepted* by the professional and law enforcement communities.

*Michaels,* 136 N.J. at 323, 642 A.2d 1372 (emphasis added).

Defendants are not required to predict what tenets will emerge in the area of interviewing alleged child sexual abuse victims. *See Myers,* 810 F.2d at 1460 (noting that "a reasonable person is not expected to act as a legal scholar and predict the future direction of the law") (citation omitted). Nor are they required to pay for their mistakes that predated and, indeed, inspired, a change in the law.

As the Supreme Court of New Jersey found, the investigation was clearly "inept." This court, too, is dismayed at how the investigation and questioning were handled. For starters, the children were interviewed numerous times, even after initially denying that abuse occurred; the investigators used suggestive and leading questions; and the children were rewarded for "correct" answers.

Michaels contends that the Supreme Court of New Jersey's finding that the investigation was inept is the same as finding that defendants were "plainly incompetent" and, thus, not entitled to qualified immunity. *See* Pl.Br. at 34; and *see Burns,* 500 U.S. at 494–95, 111 S.Ct. 1934 ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."). But there is an important distinction between what the Appellate Division and the Supreme Court of New Jersey did and said on the *Michaels* appeal and what Michaels asks this court to do today. Both of the New Jersey higher courts that dealt with the case were permitted to enjoy the benefit of hindsight; this court is not. Indeed, the information on which the Appellate Division and the New Jersey Supreme Court relied in 1993 and 1994, respectively, came from articles and journals published *after* Michaels was found guilty. *See Michaels,* 264 N.J.Super. at 622–29, 625 A.2d 489; *Michaels,* 136 N.J. at 307–12, 642 A.2d 1372. Those courts created new law; this court must apply old.

As the Fourth Circuit held, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir.1992), *cert. denied sub. nom,* 506 U.S. 1080, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993). The reasonableness of defendants' actions must be assessed, therefore, in light of the information they possessed at the time. Considering what little was known in the mid–1980's, this court cannot say that the defendants transgressed any "bright line[ ]." [15]

Thus, even assuming that improper interrogation techniques can be said to violate a constitutional right, and further assuming that defendants violated that right, Michaels has utterly failed to establish

---

**15.** One commentator stated:
> The trio of problems described above—overzealousness, inaccurate beliefs, and excessive use of leading questions—appear to have been particularly prevalent during the 1980s.... By the closing years of the decade, serious efforts were underway to improve the knowledge, skills, and objectivity of interviewers.

*See* Myers, 46 BAYLOR L.REV. at 883–84.

that the contours of that right were clearly established at the time of the violation, nor has she demonstrated that defendants acted unreasonably, in light of what limited knowledge they had.[16] Defendants' motions for summary judgment on the ground of qualified immunity are, therefore, granted and Count Four will be dismissed.

■ One final comment. The issue of immunity aside, if this court were to construe Michaels' Section 1983 claim as grounded on the common law tort of malicious prosecution—which in light of her allegations is plausible—Count Four would be dismissed for failure to state a claim.

Prior to 1994, the Court of Appeals for the Third Circuit allowed a Section 1983 malicious prosecution claim to be pled in the most liberal manner in the country. *See Albright v. Oliver,* 510 U.S. 266, 270–71 n. 4, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) ("The most expansive approach is exemplified by the Third Circuit, which holds that the elements of a malicious prosecution action under [Section] 1983 are the same as the common-law tort of malicious prosecution.") (citing *Lee v. Mihalich,* 847 F.2d 66, 70 (1988)). To successfully state a claim, a plaintiff simply had to allege the elements of common law malicious prosecution. *See Lee,* 847 F.2d at 70.

The landscape changed, however, in 1994 with the Supreme Court's plurality in *Albright.* There, the Court struck a Section 1983 malicious prosecution claim that was based on a violation of the plaintiff's substantive due process rights, but left open the possibility that such a claim could be based on a violation of Fourth Amendment rights. *See Albright,* 510 U.S. at 271, 114 S.Ct. 807.

The Third Circuit first construed *Albright* to mean that such a claim must, therefore, include not simply the elements of common law malicious prosecution but some type of seizure under the Fourth

Amendment, as well. *See Gallo v. City of Philadelphia,* 161 F.3d 217, 221–22 (3d Cir.1998). The *Gallo* court envisioned, in keeping with the Third Circuit's historically expansive view of a Section 1983 malicious prosecution claim, that a post-conviction incarceration, resulting from the alleged malicious prosecution, would satisfy *Albright*'s Fourth Amendment requirement. *See id.* at 223–24

But *Gallo* was the first, not the last, word in this Circuit. Shortly after *Gallo,* the Third Circuit again interpreted *Albright. See Torres v. McLaughlin,* 163 F.3d 169 (3d Cir.1998). Agreeing that a Section 1983 malicious prosecution claim was foreclosed under the Fourteenth Amendment's substantive due process clause, the *Torres* court interpreted *Albright* in one sense more expansively than had the *Gallo* court, viewing *Albright* as leaving open the possibility that such a claim could be based on a constitutional amendment other than the Fourth Amendment. *See id.* at 172. However, the *Torres* court also read *Albright* more narrowly than had the *Gallo* court in holding that post-conviction incarceration could *not* satisfy the seizure requirement, as the Fourth Amendment protected only against pre-conviction, rather than post-conviction, detainment. *See id.* at 174.

One, and only one, clear principle emerges: a Section 1983 malicious prosecution claim cannot be based on a substantive due process violation alone. Thus, if Count Four is construed as a Section 1983 malicious prosecution claim based on a violation of Michaels' substantive due process rights, it fails to state a claim.

### III.

For the reasons discussed above, defendants' motions for summary judgment are granted. The court declines to exercise supplemental jurisdiction over the only re-

**16.** To the extent that Michaels contends that Sencer–McArdle violated her rights by failing to give adequate advice to the investigators, this court finds that because of the uncertainty that surrounded these types of investigations in 1985, Sencer–McArdle enjoys qualified immunity as to advice she did or did not give.

maining claim, the common law malicious prosecution claim contained in Count One.[17] Count One is, therefore, remanded to Superior Court, Law Division, Essex County. An appropriate order will issue.

### ORDER

This matter having come before the court upon the motion for summary judgment on behalf of defendants, Sara Sencer–McArdle (improperly pled as "Sara Spencer–McArdle"), Essex County investigators George McGrath and Richard Mastroangelo, Division of Youth and Family Services investigator Louis Fonolleras, and psychologist Susan Esquilin (improperly pled as "Susan Esquillan"); and the court having reviewed the submissions of the parties without oral argument pursuant to Fed.R.Civ.P. 78;

IT IS on this 26th day of May, 1999, hereby

ORDERED that defendants' motions for summary judgment as to Count Four are granted; and it is further

ORDERED that Count One be and hereby is remanded to Superior Court, Law Division, Essex County; and it is further

ORDERED that defendant/third party plaintiff Esquilin's claim against defendant Health Care Insurance Company for costs incurred in defending this litigation is remanded to Superior Court, Law Division, Essex County.

---

17. Plaintiff will not be unfairly prejudiced by this court's decision not to exercise supplemental jurisdiction over Count One because the parties have conducted only limited discovery thus far. *See Growth Horizons, Inc. v. Delaware County,* 983 F.2d 1277, 1284 (3d Cir.1993) (in determining whether to dismiss supplemental claims, court should take into account "judicial economy, convenience, and fairness to the litigants") (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).