# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3654-18

L.C.[1],

    Plaintiff-Appellant,

v.

MIDDLESEX COUNTY
PROSECUTOR'S OFFICE,
COUNTY OF MIDDLESEX,
NEW JERSEY, BOROUGH OF
SAYREVILLE, NEW JERSEY,
ANDREW CAREY, Prosecutor,
Middlesex County Prosecutor's
Office, CHRISTOPHER KUBERIET,
1st Asst. Prosecutor, Middlesex
County Prosecutor's Office,
DETECTIVE DAVID ABROMAITIS,
Investigator/Detective, Middlesex
County Prosecutor's Office,
SAYREVILLE BOARD OF
EDUCATION (BOE), DR. RICHARD
LABBE, Superintendent, Sayreville
Schools (BOE), MICHAEL
MACAGNONE, President, Sayreville
Board of Education (BOE), THE

---

[1] Pursuant to R.1:38-3(d)(5) initials are continued for plaintiff to maintain confidentiality.

BUSCH LAW GROUP, JONATHAN BUSCH, attorney for the Sayreville Board of Education (BOE), ARI SCHNEIDER, attorney for the Sayreville Board of Education (BOE), TERESA RAFFERTY, Piscataway Superintendent of Schools,

        Defendants-Respondents.

_____

Argued March 16, 2021 – Decided April 9, 2021

Before Judges Haas and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-1292-17.

Kevin T. Flood argued the cause for appellant (Kevin T. Flood and Paul DePetris, on the briefs).

Elisa M. Pagano argued the cause for respondents Andrew Carey, Christopher Kuberiet, and Detective David Abromaitis (Chiesa Shahinian & Giantomasi, PC, attorneys; Matthew E. Beck, Elisa M. Pagano, and Chelsea P. Jasnoff, on the brief).

Keith J. Murphy argued the cause for respondents Dr. Richard Labbe and Michael Macagnone (Gordon Rees Scully Mansukhani, LLP, attorneys; Keith J. Murphy, of counsel and on the brief).

Meredith Kaplan Stoma argued the cause for respondents The Busch Law Group, LLC, Jonathan Busch, and Ari Schneider (Lewis Brisbois Bisgaard & Smith, LLP, attorneys; Meredith Kaplan Stoma and Jeffrey S. Leonard, on the brief).

Michael A. Pattanite, Jr., argued the cause for respondent Teresa Rafferty (Lenox Law Firm, attorneys; Michael A. Pattanite, Jr., on the brief).

PER CURIAM

Plaintiff L.C. appeals from October 5, 2017, July 23, 2018, and March 15, 2019 orders dismissing his complaint for failure to state a claim and a February 23, 2018 order denying reconsideration of the October 5, 2017 order. He also challenges a March 28, 2017 order transferring venue and an April 28, 2017 order denying reconsideration of the venue transfer.

This matter arises from numerous incidents which occurred in the Sayreville War Memorial High School (SHS) locker room in September 2014, involving plaintiff and several other juvenile members of the SHS football team regarding the alleged sexual assault of another juvenile. The Middlesex County Prosecutor's Office (MCPO) investigated the incident and charged plaintiff, then a juvenile, with offenses, which if committed by an adult, would constitute conspiracy to commit aggravated criminal sexual contact, aggravated assault, hazing, riot, and criminal restraint. Several other juveniles on the SHS football team were also charged. MCPO Detective David Abromaitis signed the complaint.

Following the filing of the juvenile complaint and based on the allegations contained in the arrest warrant, SHS suspended plaintiff for violating the Sayreville Board of Education's (SBOE) code of conduct. The day after plaintiff's suspension, his parents received notice of a disciplinary hearing regarding his suspension from the SBOE pursuant to N.J.A.C. 6A:16-7.3. On October 21, 2014, plaintiff's counsel informed SBOE plaintiff waived the time requirement set forth in N.J.A.C. 6A:16-7.3(a)(10)(iii), which requires the SBOE to hold a hearing no later than thirty days following the suspension. As a result, the SBOE adjourned the disciplinary hearing until after the final disposition of the juvenile delinquency matter.

In October 2014, Abromaitis and First Assistant Prosecutor Christopher Kuberiet disclosed the records of the charged juveniles, including plaintiff, to SBOE's attorneys, Jonathan Busch and the Busch Law Group (collectively, the Busch defendants). The Busch defendants thereafter disclosed the records to Dr. Richard Labbe, superintendent of Sayreville schools, and Michael Macagnone, president of the SBOE (collectively, the SBOE defendants).

In April 2015, the MCPO filed a second complaint charging plaintiff with four additional acts of delinquency relating to the original incident. Abromaitis signed the complaint.

4

On July 1, 2015, plaintiff was adjudicated of offenses, which if committed by an adult, would constitute criminal restraint, simple assault, and disorderly conduct, and acquitted of the remaining offenses. Following a motion for reconsideration, the Family Part judge acquitted plaintiff of criminal restraint on August 7, 2015. In August 2016, the court dismissed the adjudications for simple assault and disorderly conduct.

In the interim, on July 13, 2015, plaintiff, his parents, and his counsel met with Labbe, Busch, and Schneider regarding his return to SHS following his suspension. According to plaintiff's complaint, Labbe, Busch, and Schneider stated they would do everything in their power to prevent his return, and Busch suggested plaintiff transfer out of SHS, advising him that several of the other juveniles charged already accepted offers of transfer. Plaintiff's parents demanded a hearing and the meeting ended.

SBOE notified plaintiff his disciplinary hearing had been rescheduled for August 31, 2015. Prior to the hearing, SBOE filed an emergent application requesting permission to use the audio recordings from plaintiff's juvenile delinquency proceeding at the disciplinary hearing, which the Family Part judge denied.

A-3654-18

On August 31, 2015, the MCPO issued a "News Release" relating to the four incidents of misconduct at SHS, between September 9 and September 30, 2014. The release read as follows:

[News Release,] Sayreville football sex abuse investigation drawing to a close [(Aug. 31, 2015)]

Middlesex County Prosecutor Andrew C. Carey announced today that six of seven teenagers charged with sexually assaulting and/or abusing four other teammates at [SHS] have been placed on probationary terms and ordered to each serve [fifty] hours of community service, but will avoid being labeled as Megan's Law sex offenders.

The sentences were imposed in New Brunswick by a Family Court judge after four of the six football players pleaded guilty in Family Court to charges of committing a disorderly persons offense of hazing, and third degree endangering the welfare of their younger fellow teammates. Each of those four defendants was placed on probation for two years.

The two others were placed on one-year probationary terms after they were adjudicated delinquent following a trial in Family Court. A seventh juvenile defendant is awaiting a trial in Family Court. No trial date has been set.

Prosecutor Carey said that while these juveniles were charged with serious sexual offenses, the cases were resolved in accordance with juvenile laws and in the best interests of the juvenile defendants, the victims and their families. As part of the plea agreements, the [MCPO] did not pursue the imposition of mandatory sex offender registration required under Megan's Law.

"As was previously disclosed, the [MCPO] determined that the defendants would not be tried as adults and that the Middlesex County Family Court remains the proper venue for these cases," Prosecutor Carey said. "While the Code of Juvenile Justice provides confidentiality for the protection of juveniles, that confidentiality, unfortunately, allows for certain individuals to unscrupulously mislead the public as to what occurred at the school and during juvenile proceedings."

. . . .

"The facts that were alleged by the [MCPO] at the beginning of this case have clearly been proven in a court of law. The community of Sayreville needs to know that these serious crimes occurred, and now must work together to heal. I thank those who went to extraordinary lengths throughout the proceedings to protect the rights of the victims, the juvenile delinquents, and the families of those involved," Prosecutor Carey said.

The four juvenile defendants who have pleaded guilty have been ordered to provide truthful testimony against their co-defendants, and were ordered to have no contact with the victims.

In addition, one of them was placed on curfew while serving his two year probationary term.

As part of the plea agreements, the [MCPO] did not insist on having these juvenile defendants registered as Megan's Law offenders. The decision was reached after the [MCPO] obtained input from the victims and their families.

The two other juvenile defendants who were adjudicated delinquent on July 1, 2015, stood trial in a closed Family Court trial. Both of them were placed on probation for one year and were ordered to serve [fifty] hours of community service.

During the trial, the high school principal testified as a character witness for both of the juvenile defendants, despite having no personal knowledge of the assaults and abuses that occurred in the high school locker room.

One of the trial defendants was deemed delinquent on charges of a disorderly persons simple assault, disorderly conduct, hindering his own apprehension by lying to police and hindering the apprehension of his co-defendants by lying to police. He also was found delinquent on counts of obstruction and false swearing. The majority of the offenses would have been considered fourth degree indictable offenses, if they had been committed by an adult.

. . . .

The other juvenile tried in Family Court was found delinquent on a disorderly persons simple assault charge, and a petty disorderly persons count of engaging in disorderly conduct for his role in the hazing and sexual conduct.

Initially, the Family Court judge had adjudicated them both delinquent of criminal restraint. Following a motion by the defense to reconsider the decision, and without the receipt of any additional testimony, the judge reversed his own findings of fact, and instead found them not guilty of criminal restraint, thus sparing them from mandatory registration as Megan's Law offenders.

 A-3654-18

The seven juvenile defendants were taken into custody in October 2014, after the investigation determined they each played roles in the attacks upon their fellow teammates in four separate incidents at the high school between September 19, 2014 and September 30, 2014.

During the initial appearances, each time the seven juvenile defendants were taken into Family Court, their identities were protected by authorities who transported them in undercover vehicles and brought them into court through security entrances that are outside the public view.

The juvenile defendants were charged during an investigation by the [MCPO].

The first incident occurred on September 19, 2014, when a [seventeen]-year-old juvenile defendant "body slammed" a [fifteen]-year-old victim to the floor and pretended to stomp and kick the victim, exposing him to bodily injury.

On September 26, 2014, the same [seventeen]-year-old defendant, along with the two who were adjudicated delinquent following the trial, and another [sixteen]-year-old male who is awaiting trial, took part in an attack of a [fourteen]-year-old boy.

The victim also was forcibly knocked to the floor. One defendant held the victim, while at least two of the other defendants grabbed his penis and attempted to digitally penetrate his anus. Two to five other students, who could not be identified by the victim, surrounded him during the sexual assault.

. . . .

9

Further investigation showed that on September 29, 2014, three [fifteen]-year-old defendants were charged with sexually assaulting a [fourteen]-year-old boy, whose anus was digitally penetrated through his clothing by one of the defendants, while the other two held the victim down. All three defendants have pleaded guilty and admitted to the penetration.

The final incident occurred on September 30, 2014, when the [fifteen]-year-old male charged with the digital penetration on the previous day, swiped his fingers between the buttocks of a [fourteen]-year-old boy. The defendant also pleaded guilty to the lesser charges in that sexual assault.

On September 1, 2015, plaintiff filed a petition and motion for emergent relief with the Commissioner of Education, seeking dismissal of SBOE's disciplinary charges and reinstatement to SHS. The application was transferred to the Office of Administrative Law (OAL) for adjudication by an administrative law judge (ALJ). On September 10, 2015, the ALJ issued a written decision denying plaintiff's application. The judge also ordered SBOE to hold plaintiff's disciplinary hearing by September 16, 2015. The SBOE scheduled a hearing for that date.

On September 3, 2015, the SBOE filed a motion in the Family Part for leave to admit a portion of MCPO's investigation file at the disciplinary hearing and to introduce testimony from Abromaitis relating to his investigation of the

underlying incident. The day before plaintiff's disciplinary hearing, the Family Part judge denied SBOE's motion to admit MCPO's investigation file but permitted the introduction of Abromaitis's testimony limited to matters within his personal knowledge, not the investigation file. The judge stayed plaintiff's disciplinary hearing pending appeal. On September 15, 2015, SBOE advised plaintiff his disciplinary hearing was canceled pending an appeal of the judge's order.

On September 17, 2015, we granted plaintiff's application for leave to appeal, which sought to vacate the stay of the disciplinary hearing. However, pending appeal, plaintiff's parents transferred custody of him to a family member residing in Piscataway so plaintiff could attend Piscataway High School (PHS) for his senior year, where plaintiff wished to play football. SBOE signed waiver forms to permit the other SHS students involved in the incident, all of whom entered pleas in their juvenile matters and transferred from SHS, to participate on their new high school football teams. Although SBOE initially indicated it would sign a waiver form for plaintiff, it subsequently refused to do so. Piscataway Schools Superintendent Teresa Rafferty permitted plaintiff to enroll at PHS, but precluded him from participating in athletics because his

11

juvenile adjudications and participation on the team could endanger PHS's New Jersey State Interscholastic Athletic Association (NJSIAA) eligibility.

On October 20, 2015, we denied plaintiff's motion to vacate the stay and reversed and remanded the part of the Family Part judge's order holding SBOE was not entitled to the records from plaintiff's juvenile delinquency proceedings. We instructed the judge to determine whether good cause existed to release plaintiff's records pursuant to N.J.S.A. 2A:4A-60(a)(6).

By letter dated November 3, 2015, plaintiff's counsel advised the Family Part judge plaintiff no longer intended to return to SHS, and withdrew the request for a disciplinary hearing. On November 8, 2015, plaintiff's counsel again wrote to the judge reiterating his position the court did not need to conduct the remand proceedings to determine if there was good cause to release plaintiff's records.

On November 9, 2015, SBOE's counsel wrote to the judge with concerns plaintiff would not concede he waived his right to a disciplinary hearing and accepted the discipline imposed by SBOE. SBOE's counsel also voiced concern plaintiff would later file a civil suit arguing SBOE deprived him of a disciplinary hearing or SBOE's disciplinary decision was arbitrary. MCPO joined SBOE's position.

The Family Part judge sought clarification from us as to whether a decision on the remand issue was necessary. We advised the remand hearing was not mandatory, unless plaintiff's counsel indicated in writing he required a determination in order to further litigate the matter. On December 7, 2015, plaintiff's counsel sent a letter to the OAL waiving the hearing, stating the matter was moot.

On January 20, 2017, plaintiff filed a complaint in the Law Division against the MCPO, Prosecutor Andrew Carey, Kuberiet, and Abromaitis (collectively, the MCPO defendants); the Busch defendants; the SBOE defendants; Rafferty; the Borough of Sayreville; and County of Middlesex. On February 16, 2017, plaintiff filed a first amended complaint alleging the following counts: violations of the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2 (NJCRA) (count one); violation of the Juvenile Justice Code, N.J.S.A. 2A:4A-20 to -92 (count two); malicious prosecution (count three); abuse of process (count four); negligent supervision/respondent superior (count five); defamation-libel (count six); defamation-slander (count seven); invasion of privacy-false light (count eight); negligence (count nine); intentional negligent infliction of emotional distress (IIED) (count ten); negligent infliction of

emotional distress (count eleven); civil conspiracy (count twelve); punitive damages (count thirteen); and invasion of privacy (counts fourteen and fifteen).

On March 28, 2017, the Middlesex Vicinage Assignment Judge sua sponte transferred venue to Monmouth Vicinage pursuant to Rule 4:3-3(a), in order to "avoid all appearance of any perceived conflict." Plaintiff filed a motion for reconsideration, which the Assignment Judge denied following oral argument on April 28, 2017. The judge reasoned the prosecutors' regular appearances before the judges in Middlesex Vicinage, the interests of justice, and to avoid any appearance of impropriety or perceived conflict necessitated the transfer.

In May 2017, the Busch defendants, MCPO defendants, SBOE defendants, Borough of Sayreville, and Middlesex County filed motions to dismiss the first amended complaint pursuant to Rule 4:6-2(e) for failure to state a claim upon which relief can be granted. On October 5, 2017, the court entered an order dismissing several counts by consent against each defendant and adjudicating dismissal of claims against the Borough and the County; we address the dismissals related to the parties involved in this appeal. As to the SBOE and MCPO defendants, the court dismissed the NJCRA equal protection claim in count one without prejudice, as well as counts six and seven, and dismissed the NJCRA substantive due process claim in counts one, four, eight, ten, twelve,

thirteen, and fifteen with prejudice. As to the Busch defendants, the court dismissed counts six and seven without prejudice and dismissed counts one, two, four, five, and eight through thirteen with prejudice.

The court also granted plaintiff leave to file a second amended complaint "to allege sufficient facts . . . to pursue civil rights claims against the [SBOE] . . . [and] the [MCPO] defendants on the basis of violation of equal protection rights" and to further address the counts which were dismissed without prejudice, including those against the Busch defendants. Plaintiff filed a motion for reconsideration, which the court denied on February 23, 2018, following a two-day oral argument. Contrary to plaintiff's arguments, the court concluded it made adequate findings in support of its October 2017 order and plaintiff's disagreement with the decision was not grounds for reconsideration. The court granted plaintiff leave to file a second amended complaint.

On April 2, 2018, plaintiff filed a second amended complaint, restating the original fifteen counts[2], and adding eight additional counts including a cause of action under NJCRA pled with greater specificity against the SBOE and MCPO defendants (count sixteen), and additional claims alleging violations of

---

[2] The second amended complaint named count three only to indicate it had been dismissed against all defendants by consent.

the Federal Civil Rights Act (FCRA), 42 U.S.C. § 1983 against the SBOE, MCPO, and Busch defendants (counts seventeen through twenty-two) and Rafferty (count twenty-three). The MCPO defendants, Busch defendants, SBOE defendants, Borough, and County moved to dismiss the second amended complaint pursuant to Rule 4:6-2(e). The court made detailed oral findings and entered an order granting defendants' motions dismissing the second amended complaint with prejudice on July 23, 2018.

In October 2018, Rafferty moved to dismiss the claims against her set forth in the second amended complaint pursuant to Rule 4:6-2(e). On March 15, 2019, the court made detailed oral findings and granted the motion, dismissing the claims against Rafferty with prejudice.

Plaintiff raises the following points on appeal:

> I.     THE TRIAL COURT ERRED BY DISMISSING VIOLATIONS OF THE [NJCRA] AS TO SUBSTANTIVE DUE PROCESS.
>
> A.     The CRA Generally.
>
> B.     The SBOE Defendants And Busch Defendants Acted Under Color of Law
>
> C.     The Trial Court Erred By Applying Waiver
>
> D.     Exhaustion Of Administrative Remedies Is No Defense

16

E.      The Litigation Privilege Is No Defense

F.      Kuberiet And Carey Aren't Entitled To Absolute Immunity As They Were Acting In Their Administrative Capacities When They Violated Plaintiff's Constitutional Rights

G.      Qualified Immunity Can't Be Decided Yet

H.      Qualified Immunity Doesn't Bar Declaratory And Injunctive Relief [Not Raised Below As To All Defendants]

II.     THE TRIAL COURT ERRED BY DISMISSING VIOLATIONS OF THE [NJCRA] AS TO EQUAL PROTECTION

III.    THE TRIAL COURT ERRED BY DISMISSING VIOLATIONS OF THE [FCRA] (PRIVACY, PROCEDURAL AND SUBSTANTIVE DUE PROCESS) FOR IMPROPERLY LABELING PLAINTIFF A SEX OFFENDER WITH PREJUDICE

IV.     THE TRIAL COURT ERRED BY DISMISSING VIOLATIONS OF THE [FCRA] (PROCEDURAL DUE PROCESS) FOR IMPROPERLY DISCLOSING JUVENILE RECORDS

V.      THE TRIAL COURT ERRED BY DISMISSING RAFFERTY ALLEGING VIOLATIONS OF THE [FCRA] (PRIVACY, PROCEDURAL AND SUBSTANTIVE DUE PROCESS) FOR IMPROPERLY USING PAST JUVENILE ADJUDICATIONS OF PLAINTIFF TO DISCRIMINATE AGAINST PLAINTIFF

VI.     THE TRIAL COURT ERRED BY DISMISSING RAFFERTY ALLEGING VIOLATIONS OF THE

17

[FCRA] (PRIVACY, PROCEDURAL AND SUBSTANTIVE DUE PROCESS) FOR IMPROPERLY USING PAST JUVENILE ADJUDICATIONS OF PLAINTIFF TO DISCRIMINATE AGAINST PLAINTIFF

VII. THE TRIAL COURT ERRED BY DISMISSING CIVIL CONSPIRACY

VIII. THE TRIAL COURT ERRED BY DISMISSING DEFAMATION (LIBEL AND SLANDER) AGAINST KUBERIET AND CAREY

    A. Defamation Generally

    B. Plaintiff Was a Private Person And Plaintiff [Should] Be Afforded The Opportunity To Conduct Discovery To Prove Those Claims

    C. The Defamation Claims Were Sufficiently Pled Against Kuberiet And Carey

IX. THE TRIAL COURT ERRED BY TRANSFERRING THE CASE FROM MIDDLESEX COUNTY TO MONMOUTH COUNTY

I.

"A motion to dismiss under Rule 4:6-2(e) requires application of 'the test for determining the adequacy of a pleading: whether a cause of action is "suggested" by the facts.'" Gonzalez v. State Apportionment Comm'n, 428 N.J. Super. 333, 349 (App. Div. 2012) (quoting Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)). "A complaint should be dismissed for

18

failure to state a claim pursuant to <u>Rule</u> 4:6-2(e) only if 'the factual allegations are palpably insufficient to support a claim upon which relief can be granted.'" <u>Frederick v. Smith</u>, 416 N.J. Super. 594, 597 (App. Div. 2010) (quoting <u>Rieder v. State Dep't of Transp.</u>, 221 N.J. Super. 547, 552 (App. Div. 1987)).

"In evaluating motions to dismiss, courts consider 'allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim.'" <u>Banco Popular N. Am. v. Gandi</u>, 184 N.J. 161, 183 (2005) (quoting <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 222 n. 3 (3d Cir. 2004)). The inquiry is limited to examining the legal sufficiency of the facts alleged only on the face of the complaint; neither the trial nor appellate court is concerned with the weight, worth, nature, or extent of the evidence. <u>Dolson v. Anastasia</u>, 55 N.J. 2, 5-6 (1969).

A "with-prejudice" dismissal of a plaintiff's complaint will be reversed if it is "premature, overbroad, . . . [or] based on a mistaken application of the law." <u>Flinn v. Amboy Nat'l Bank</u>, 436 N.J. Super. 274, 287 (App. Div. 2014). When we review a trial court's ruling dismissing claims against a party under <u>Rule</u> 4:6-2(e), we apply a plenary standard of review which owes no deference to the trial court's conclusions. <u>Bacon v. N.J. State Dep't of Educ.</u>, 443 N.J. Super. 24, 33 (App. Div. 2015).

"Motions for reconsideration are granted only under very narrow circumstances . . . ." Fusco v. Bd. of Educ. of Newark, 349 N.J. Super. 455, 462 (App. Div. 2002). Reconsideration should be used only for those cases where "either (1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or (2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence." Ibid. (quoting D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990)). We review the trial court's denial of reconsideration for an abuse of discretion. Cummings v. Bahr, 295 N.J. Super. 374, 389 (App. Div. 1996).

## II.

In points I and II, plaintiff contends that the trial court erred by dismissing his substantive due process and equal protection claims brought pursuant to the NJCRA.

Regarding the substantive due process claims, plaintiff argues: (1) the SBOE and Busch defendants acted under color of state law; (2) waiver did not bar his claim; (3) the exhaustion of administrative remedies was not a defense to his claim; (4) the litigation privilege did not apply; (5) Kuberiet and Carey were not entitled to prosecutorial immunity; and (6) for the first time on appeal

asserts qualified immunity does not bar declaratory and injunctive relief as to all defendants.  We address these arguments in turn.

A plaintiff asserting a claim pursuant to the NJCRA, must allege:  (1) the constitution or law of this state conferred on him a substantive right; (2) defendants deprived him of that right or interfered with that right by threats, intimidation or coercion; and (3) the defendants were acting under color of law when they did so.  Tumpson v. Farina, 218 N.J. 450, 473 (2014) (quoting N.J.S.A. 10:6-2(c)).

At the outset, we note plaintiff's brief does not identify any substantive rights violated by defendants.  Generally, "[t]he failure to adequately brief the issues requires it to be dismissed as waived."  Weiss v. Cedar Park Cemetery, 240 N.J. Super. 86, 102 (App. Div. 1990).  Notwithstanding, we presume plaintiff's substantive due process claims are based on the fact his suspension deprived him of the opportunity to play football.  However, participation in extracurricular activities, such as athletics, is a privilege, not a protected interest.  See Todd v. Rush Cnty. Sch., 133 F.3d 984, 986 (7th Cir.) (observing that extracurricular activities, like athletics, are a privilege), cert. denied, 525 U.S. 824 (1998).

Furthermore, to the extent plaintiff's claims are based on the argument he was deprived of a timely disciplinary hearing and his juvenile records were disclosed without prior court approval in violation of N.J.S.A. 2A:4A-60, which states the records of "juveniles charged as a delinquent . . . shall be strictly safeguarded from public inspection[,]" such claims are procedural in nature and not cognizable under the NJCRA. See Coles v. Carlini, 162 F. Supp. 3d 380, 402 (D.N.J. 2015) (finding NJCRA does not provide for vindication of procedural due process rights, only substantive rights); Tumpson, 218 N.J. at 478 (to recover under NJCRA, plaintiffs must show the right allegedly violated was substantive, not procedural).

We also reject plaintiff's argument a NJCRA claim was viable against the SBOE and Busch defendants because they were acting under color of law. Private actions under the NJCRA for violation of an individual's substantive rights only lie against persons acting under "color of law," N.J.S.A. 10:6-2(c), meaning the exercise of power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Polk Cnty. v. Dodson, 454 U.S. 312, 317-18 (1981) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). "A private actor may be deemed to have acted under color of state law only where his or her conduct is 'fairly attributable

22

to the state.'"  Poling v. K. Hovnanian Enters., 99 F. Supp. 2d 502, 513 (D.N.J. 2000) (quoting Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982)).  The "relevant question" is not simply whether a private person or group is serving a "public function," but whether the function performed has been "traditionally the exclusive prerogative of the State."  Rendell-Baker, 457 U.S. at 842 (emphasis omitted) (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 353 (1974)).  Thus, the fact that "a private entity performs a function which serves the public does not make its acts state action."  Ibid.

Concluding the Busch defendants did not act under color of law, the trial court stated:

> Set forth in the complaint, the Busch defendants were contracted to provide legal services to the [SBOE], which is a private function not performed by the State.
>
> The actions alleged by plaintiff were conducted by the Busch defendants during the course of their representation of the [SBOE].  And no factual basis has been presented to attribute to the Busch defendants' actions which were performed by the State.

We discern no reversible error.  We have stated:  "It is clear that an attorney acts as an agent for his client," Hewitt v. Allen Canning Co., 321 N.J. Super. 178, 184 (App. Div. 1999), but a "lawyer, although required to work for the client's benefit, has considerable independence in doing so."  Cohen v.

23

Southbridge Park, Inc., 369 N.J. Super. 156, 161 (App. Div. 2004) (quoting Restatement (Third) of The Law Governing Lawyers, Introductory Note to Chapter 2, The Client–Lawyer Relationship (2000)). Thus, "attorneys are also independent contractors as well as agents." Ibid. (quoting McCarthy v. Recordex Serv., Inc., 80 F.3d 842, 853 (3d Cir.), cert. denied, 519 U.S. 825 (1996)). Therefore, the Busch defendants were neither state actors nor acting "under color of law" because they represented a public entity. Polk Cnty., 454 U.S. at 318.

We also reject plaintiff's argument the trial court's finding he waived his claims was error. Waiver is the voluntary and intentional relinquishment of a known right. Knorr v. Smeal, 178 N.J. 169, 177 (2003). In Knorr, the New Jersey Supreme Court explained:

> An effective waiver requires a party to have full knowledge of his legal rights and intent to surrender those rights. The intent to waive need not be stated expressly, provided the circumstances clearly show that the party knew of the right and then abandoned it, either by design or indifference. The party waiving a known right must do so clearly, unequivocally, and decisively.
>
> [Ibid. (citations omitted).]

In holding plaintiff waived his substantive due process claim, the court stated:

24

Plaintiff . . . fails to account for the fact that he was afforded a hearing and had a full opportunity to litigate the issues raised against the [SBOE] defendants regarding his school discipline.  N.J.S.A. 18A:37-5 grants the [SBOE] the authority to impose a long-term suspension or expulsion.

There is no dispute the [SBOE] followed the processes enumerated in N.J.A.C. 6A:16-7.3(a), et seq, and afforded plaintiff a formal hearing on the proposed discipline.

However, the proceedings were originally stayed at plaintiff's request pending the outcome of the juvenile proceedings . . . .

The Appellate Division later remanded the matter back to the [t]rial [c]ourt . . . [and o]n remand, plaintiff requested the [t]rial [c]ourt not issue a ruling on the good cause standard on the basis that the issue was moot because plaintiff no longer intended to return to . . . [SHS], and therefore no longer desired to have a disciplinary hearing to challenge his suspension.

The [SBOE] and the [MCPO] defendants took issue with the contention, and sought a ruling on the issue of whether plaintiff waived his right to a disciplinary hearing.

When plaintiff failed to inform the [c]ourt in writing he intended to litigate the matter further, as was ordered by the Appellate Division, plaintiff effectively waived his right to continue to litigate.

Plaintiff further withdrew his petition before the Commissioner wherein he sought dismissal of the disciplinary charges, and demanded reinstatement at

25

[SHS], thus failing to exhaust his statutory administrative remedies prior to filing this case.

Therefore, as plaintiff was clearly provided the opportunity for a hearing, and informed that he had a right to continue with the litigation, and chose not to proceed, plaintiff has not only failed to allege any viable claim, but cannot now attempt to re-litigate a challenge to a suspension claiming the [SBOE] violated his rights to a thorough and efficient system of education.

. . . .

. . . [T]he precise issue regarding disclosure of the records and whether good cause existed for . . . the [SBOE] defendants to possess the records, was previously remanded by the Appellate Division for a determination by the [t]rial [c]ourt in the plaintiff's juvenile case.

Plaintiff informed the [c]ourt the issue was moot, and he had no intent further of litigating the matter.

Additionally, plaintiff fails to realize that when an allegation as serious as sexual misconduct in a school locker room arises and criminal charges are brought, the [MCPO] defendants are entitled to all of plaintiff's disciplinary records.

The trial court did not err. A Board of Education has the authority to suspend or expel a pupil. N.J.S.A. 18A:37-5. In each instance of a long-term suspension, the Board must hold a hearing on the proposed discipline and render a decision. N.J.A.C. 6A:16-7.3(a). The decision of the Board may then be

26

appealed to the Commissioner of Education. N.J.A.C. 6A:16-7.3(b); N.J.S.A. 18A:37-2.4. The Commissioner makes the final agency decision, which may then be subject to appellate review. N.J.S.A. 18A:6-9.1.

It is undisputed plaintiff was provided the opportunity to challenge his suspension at a disciplinary hearing pursuant to N.J.A.C. 6A:16-7.3(a). At plaintiff's request, the hearing was deferred until after the juvenile delinquency proceedings concluded. Thereafter, plaintiff's counsel advised the trial court the disciplinary matter was moot because plaintiff no longer intended to return to SHS or challenge his suspension. Plaintiff's actions constituted an unequivocal waiver.

Plaintiff contends the court's finding he failed to exhaust his administrative remedies was erroneous because "[a]dministrative courts [do] not have jurisdiction to hear the issue regarding access to, and/or disclosure of . . . juvenile records of law enforcement." He also argues "[a]dministrative [c]ourts do NOT have jurisdiction to award attorney fees or monetary damages and therefore it was impossible for [p]laintiff to exhaust his administrative remedies regarding his civil cause of action." Furthermore, he argues "[b]y the time the Appellate Division rendered its decision, the football season was over, making

27

any attempt of seeking redress for returning to play football through the administrative courts futile."

"[T]he exhaustion of remedies requirement is a rule of practice designed to allow administrative bodies to perform their statutory functions in an orderly manner without preliminary interference from the courts." Brunetti v. Borough of New Milford, 68 N.J. 576, 588 (1975). "Exhaustion of administrative remedies before resort to the courts is a firmly embedded judicial principle. This principle requires exhausting available procedures, that is, 'pursuing them to their appropriate conclusion and, correlatively . . . awaiting their final outcome before seeking judicial intervention.'" Garrow v. Elizabeth Gen. Hosp. & Dispensary, 79 N.J. 549, 558-59 (1979) (second alteration in original) (citations omitted) (quoting Aircraft & Diesel Equip. Corp. v. Hirsch, 331 U.S. 752, 767 (1947)). Our Supreme Court has explained

> the doctrine of exhaustion of administrative remedies serves three primary goals: (1) the rule ensures that claims will be heard, as a preliminary matter, by a body possessing expertise in the area; (2) administrative exhaustion allows the parties to create a factual record necessary for meaningful appellate review; and (3) the agency decision may satisfy the parties and thus obviate resort to the courts.
>
> [Atl. City v. Laezza, 80 N.J. 255, 265 (1979).]

However, "[t]he exhaustion doctrine is not an absolute." Garrow, 79 N.J. at 561. "Exceptions exist when only a question of law need be resolved; when the administrative remedies would be futile; when irreparable harm would result; when jurisdiction of the agency is doubtful; or when an overriding public interest calls for a prompt judicial decision." Ibid. (citations omitted).

The Commissioner of Education has "plenary" authority over education-related matters, Archway Programs, Inc. v. Pemberton Twp. Bd. of Educ., 352 N.J. Super. 420, 424 (App. Div. 2002), and "fundamental and indispensable jurisdiction over all disputes and controversies arising under the school laws," Hinfey v. Matawan Reg'l Bd. of Educ., 77 N.J. 514, 525 (1978). N.J.S.A. 18A:6-9 states: "The commissioner shall have jurisdiction to hear and determine, without cost to the parties, all controversies and disputes arising under the school laws, excepting those governing higher education, or under the rules of the State board or of the commissioner." The Commissioner's jurisdiction includes the power to resolve issues implicating constitutional claims. Desilets v. Clearview Reg'l Bd. of Educ., 137 N.J. 585, 595-96 (1994). "[W]ith respect to school-law controversies, particularly where a local board's decision is challenged, it is the exhaustion of remedies doctrine which requires first resort

29

to the administrative process." Theodore v. Dover Bd. of Educ., 183 N.J. Super. 407, 414 (App. Div. 1982).

Plaintiff was required to exhaust his administrative remedies prior to instituting the Law Division action. He commenced, but then withdrew from the administrative dispute resolution process, advising the issue was moot. As the trial court correctly determined, plaintiff's actions prevented a proper resolution of his challenge to the disciplinary action. We find no error in the decision to dismiss his complaint accordingly.

Plaintiff contends the court erred by finding the SBOE defendants were protected under the litigation privilege. He argues the privilege did not apply because "[t]he SBOE, Labbe[,] and Macagnone were[ not] litigants or other participants authorized by law at [p]laintiff's juvenile delinquency trial." He contends he "has a procedural due process right to not hav[e] the records disclosed without first being heard by a court of law or at a minimum, seeking permission from his parents."

The litigation privilege generally protects attorneys and litigants "from civil liability arising from words . . . uttered in the course of judicial proceedings." Loigman v. Twp. Comm. of Middletown, 185 N.J. 566, 579 (2006). See also Ruberton v. Gabage, 280 N.J. Super. 125, 132 (App. Div. 1995)

("A statement made in the course of judicial, administrative or legislative proceedings is absolutely privileged and wholly immune from liability."). The privilege shields "any communication: (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." Hawkins v. Harris, 141 N.J. 207, 216 (1995) (quoting Silberg v. Anderson, 50 Cal. 3d 205, 369 (1990)).

The privilege is not confined to the courtroom and "extends to all statements or communications in connection with the judicial proceeding." Ruberton, 280 N.J. Super. at 133. It "extends not only to testimony and documents admitted in evidence but also to documents utilized in the preparation of judicial proceedings." Durand Equip. Co. v. Superior Carbon Prods., Inc., 248 N.J. Super. 581, 584 (App. Div. 1991). See also DeVivo v. Ascher, 228 N.J. Super. 453, 457 (App. Div. 1988) (litigation privilege "may be extended to statements made in the course of judicial proceedings even if the words are written or spoken maliciously, without any justification or excuse, and from personal ill will or anger against the party defamed"). Additionally, pretrial communications by parties and witnesses are protected "to promote the development and free exchange of information and to foster judicial and extra-

judicial resolution of disputes." Hawkins, 141 N.J. at 218 (quoting Gen. Elec. Co. v. Sargent & Lundy, 916 F.2d 1119, 1129 (6th Cir. 1990)). "The only limitation which New Jersey places upon the privilege is that the statements at issue 'have some relation to the nature of the proceedings.'" Rabinowitz v. Wahrenberger, 406 N.J. Super. 126, 134 (App. Div. 2009) (quoting Hawkins, 141 N.J. at 215).

Plaintiff's arguments are unpersuasive. It is evident, as the trial court concluded, the statements made by the SBOE defendants, and the evidence disclosed by them, was in anticipation of, and preparation for, plaintiff's disciplinary hearing, which was a quasi-judicial proceeding. See Pa. R.R. Co. v. N.J. State Aviation Comm'n, 2 N.J. 64, 70 (1949) ("Where the administrative tribunal is under a duty to consider evidence and apply the law to the facts as found, thus requiring the exercise of a discretion or judgment judicial in nature on evidentiary facts, the function is quasi judicial and not merely ministerial."). Therefore, regardless of the reasons for disclosures, the litigation privilege applied.

Plaintiff contends Kuberiet and Carey were not entitled to absolute prosecutorial immunity. He argues their "conduct of disclosing [p]laintiff's juvenile records to other defendants, along with labeling [p]laintiff a sex

offender in a post adjudication press release, do not relate to an advocate's preparation for the initiation of a prosecution or for a judicial proceeding and therefore, are[ not] entitled to absolute immunity."

Prosecutors enjoy absolute immunity for claims brought under statutory and common law alleging the deprivation of rights. Imbler v. Pachtman, 424 U.S. 409, 427 (1976). Absolute prosecutorial immunity is granted out of "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." Id. at 423. Although absolute immunity "does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty," the broader public interest promoting a prosecutor's "vigorous and fearless performance" of the office's duties must prevail. Id. at 427. However, a prosecutor's administrative duties and investigatory functions that do not relate to the preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity. Burns v. Reed, 500 U.S. 478, 494-96 (1991).

To determine whether particular actions of government officials are entitled to absolute immunity, courts apply a "functional approach," see id. at

486, which considers "the nature of the function performed, not the identity of the actor who performed it," Forrester v. White, 484 U.S. 219, 229 (1988). See also Michaels v. New Jersey, 50 F. Supp. 2d 353, 359 (D.N.J. 1999). When a prosecutor functions as an administrator rather than an officer of the court, the prosecutor is entitled only to qualified immunity. Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993). The official seeking immunity has the burden to show immunity is justified for the function in question. Burns, 500 U.S. at 486.

The trial court stated:

> Here, while plaintiff alleges the [MCPO] defendants violated his constitutional rights for their alleged wrongful acts in the investigation of him, such investigations were clearly done in preparation for the prosecution of plaintiff or anyone else. And plaintiff was, in fact, subsequently charged.
>
> However, to the extent that the complaint centers on the [MCPO] defendants['] individual activity that cannot be argued to be in furtherance or preparation of plaintiff's prosecution[, t]he doctrine of qualified immunity must be examined to determine [i]f the defendants are shielded from liability.

It is evident the trial court found this aspect of plaintiff's claims was barred by the litigation privilege, not absolute prosecutorial immunity. Plaintiff's argument to the contrary lacks merit.

34

Plaintiff contends the court erred by finding Kuberiet and Carey were entitled to qualified immunity. He argues "[a] full analysis of whether qualified immunity applies to [p]laintiff's claims against [d]efendants is premature because there are unresolved questions of fact relevant to the analysis, including whether defendants knowingly violated the law, as suggested in the second [amended] complaint." Plaintiff also argues "[q]ualified immunity does[ not] bar actions for injunctive relief. Even where the lower [court] found qualified immunity for the respective defendants, [he] is still entitled to declaratory and injunctive relief under the FCRA and [NJ]CRA."

Qualified immunity is an affirmative defense that may be raised where claims are brought against a government official pursuant to 42 U.S.C. § 1983 and the NJCRA. Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982); Gormley v. Wood-El, 218 N.J. 72, 97-98, 113-15 (2014). Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Pearson v. Callahan, 555 U.S. 223, 231

(2009) (quoting <u>Groh v. Ramirez</u>, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). "Whether an official is covered by qualified immunity is a matter of law to be decided by a court." <u>Gormley</u>, 218 N.J. at 113.

Qualified immunity, however, is not available if the unlawfulness of the official's act is objectively apparent given the pre-existing law at the time of the alleged deprivation of rights. <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). In other words, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." <u>Id.</u> at 639 (quoting <u>Harlow</u>, 457 U.S. at 819 and 818).

"[T]he 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved prior to discovery."" <u>Pearson</u>, 555 U.S. at 231 (quoting <u>Anderson</u>, 483 U.S. at 640 n.2). "Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should . . . permit the resolution of many insubstantial claims on summary judgment." <u>Harlow</u>, 457 U.S. at 818.

A right is clearly established when "'[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Gormley, 218 N.J. at 113 (first alteration in original) (quoting Anderson, 483 U.S. at 640). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Harlow, 457 U.S. at 818-19.

As we noted, plaintiff's complaint failed to identify any substantive right violated in support of his NJCRA and constitutional claims. Thus, the trial court correctly determined defendants were entitled to qualified immunity. We decline to consider plaintiff's argument qualified immunity did not bar his ability to seek injunctive relief because his complaint did not seek this relief and he did not raise this argument before the trial court. Therefore we do not consider it on appeal. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973).

In point II of his brief, plaintiff contends the trial court erred by dismissing his NJCRA equal protection claim. He argues "[t]he SBOE has a history and tradition of treating African American students differently from non-African American students" and he was treated differently than a white student (John Doe 1). Plaintiff asserts:

The MCPO defendants never disclosed to the SBOE or the Busch defendants the confidential records of John Doe 1 . . . . The SBOE defendants did[ not] drag John Doe 1 through the [c]ourt system in order to have his records used at a long term suspension hearing in violation of his due process rights.

The fundamental guarantee to equal protection of the laws embraced by Article I, Paragraph 1 of the New Jersey Constitution does not require all persons be treated alike. In re Contest of Nov. 8, 2011, 210 N.J. 29, 48 (2012); Lewis v. Harris, 188 N.J. 415, 442 (2006). Rather, "[t]o establish a violation of the equal protection clause, a plaintiff must show that the allegedly offensive categorization invidiously discriminates against the disfavored group." In re Contest of Nov. 8, 2011, 210 N.J. at 48 (quoting Price v. Cohen, 715 F.2d 87, 91 (3d Cir. 1983)). The test involves weighing "the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." Lewis, 188 N.J. at 468 (quoting Sojourner A. v. N.J. Dep't of Hum. Servs., 177 N.J. 318, 333 (2003)). "The test is a flexible one, measuring the importance of the right against the need for the governmental restriction." Id. at 443. "Under that approach, each claim is examined 'on a continuum that reflects the nature of the burdened right and the importance of the governmental restriction.'" Ibid. (quoting Sojourner A., 177 N.J. at 333).

In dismissing plaintiff's equal protection claim against the SBOE defendants, the trial court stated:

> Here, plaintiff's equal protection claims against the [SBOE] defendants must fail as a matter of law. Applying the analytical framework established in Greenberg[ v. Kimmelman, 99 N.J. 552 (1985)], the [c]ourt finds no equal protection violation because plaintiff has not suffered a loss of [a] fundamental right.
>
> . . . .
>
> Plaintiff fails to make a showing the [SBOE] defendants unevenly applied Federal or State laws, rather the gravamen in the claim for equal protection violation centers on the difference in disciplinary treatment he received in comparison to another student involved in another matter.
>
> . . . .
>
> . . . Plaintiff continues to address the difference in how he was treated in comparison to that of John Doe 1, yet the [c]ourt has previously addressed this issue, maintaining no Federal or State Constitutional rights were infringed upon in this matter.

Regarding the MCPO defendants, the court stated:

> Prosecutors are subject to varying levels of official immunity. Absolute immunity attaches to all actions performed in a quasi-judicial role, Imbler, [424 U.S. at 430].
>
> This includes activity taken while in court such as the presentation of evidence or legal argument as well as selected out of court behavior intimately

39

associated with the judicial phases of litigation, Kulwicki [v. Dawson, 969 F.2d 1454, 1463 (3d Cir. 1992).]

Plaintiff's claims against Kuberiet and Carey's conduct center on their prosecutorial discretion. As stated in Imbler absolute immunity attaches for all actions taken in a quasi-judicial role. Plaintiff attempts to argue that defendants acted arbitrarily and maliciously but offers no proofs other than the allegations made in this complaint.

Again, plaintiff refers to the [p]rosecutor's actions in handling the John Doe matter[,] but the [c]ourt has already determined he failed to establish that both were similarly situated individuals who received unequal treatment of governing law. There are also additional facts and differences between the two cases plaintiff fails to address.

To reiterate, school disciplinary actions fail to serve as a basis for equal protection claims. The complaint fails to establish the [MCPO] defendants were not acting in their official capacity during the investigation.

We affirm substantially for the reasons expressed by the trial court. We add the following comments. Plaintiff's equal protection claims failed because his complaint did not identify the deprivation or violation of any fundamental right. Further, he failed to establish the law was unevenly applied to him in comparison to another similarly situated individual. See e.g., Startzell v. City of Phila., 533 F.3d 183, 203 (3d Cir. 2008) ("Persons are similarly situated under

the Equal Protection Clause when they are alike 'in all relevant aspects.'") (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)). See also In re T.J.S., 419 N.J. Super. 46, 58-59 (App. Div. 2011) ("Indeed, the constitutional guarantee 'does not demand that things that are different in fact be treated the same in law . . . .'") (quoting State v. Chun, 194 N.J. 54, 103 (2008), aff'd, 212 N.J. 334 (2012)).

Plaintiff argues John Doe 1 received less severe discipline; however, John Doe 1 was involved in a wholly unrelated incident described as an assault during which John Doe 1 punched a fellow student more than twenty times. Plaintiff's complaint does not allege John Doe 1 had a disciplinary hearing while plaintiff was denied one on the basis of race. Indeed, plaintiff fails to identify what disciplinary action was taken against John Doe 1 or how it differed from the discipline he received.

Plaintiff's claims against the MCPO defendants fail for similar reasons. From the Prosecutor's perspective, the incident involving John Doe 1 was a fist fight between two high school students, which was wholly different from plaintiff's alleged conduct. No reasonable inference can be drawn that plaintiff's race motivated the MCPO defendants to disclose his information during a quasi-

41

judicial proceeding or the related investigation because plaintiff and John Doe 1 were not similarly situated "in all relevant respects."

## III.

In points III, IV, and V of his brief, plaintiff argues the trial court erred in dismissing his FCRA claims against Kuberiet, Carey, and Rafferty.

## A.

Plaintiff contends the trial court erred by dismissing his section 1983 claims against Kuberiet and Carey because these defendants labeled him a sex offender in a news release, violating his "privacy, procedural and substantive due process rights under the United States Constitution and rights under the Code of Juvenile Justice." Plaintiff argues he "pled sufficient facts to suggest a[n] FCRA cause of action for his being labeled a sex offender."

The United States Supreme Court explained the Fourteenth Amendment Due Process Clause as follows:

> By requiring the government to follow appropriate procedures when its agents decide to "deprive any person of life, liberty, or property," the Due Process Clause promotes fairness in such decisions. And by barring certain government actions regardless of the fairness of the procedures used to implement them, . . . it serves to prevent governmental power from being "used for purposes of oppression[]" . . . .

A-3654-18

> [Daniels v. Williams, 474 U.S. 327, 331 (1986) (quoting Den Ex Dem. Murray v. Hoboken Land & Improv. Co., 59 U.S. 272, 277 (1856)).]

"[T]he substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that 'shocks the conscience.'" Fagan v. City of Vineland, 22 F.3d 1296, 1303 (3d Cir. 1994) (citations omitted).

"Generally speaking, [42 U.S.C.] section 1983 provides a cause of action in state or federal courts to redress federal constitutional and statutory violations by state officials." Bernstein v. State, 411 N.J. Super. 316, 335-36 (App. Div. 2010) (quoting Gen. Motors Corp. v. City of Linden, 143 N.J. 336, 341 (1996), cert. denied, 519 U.S. 816). To prevail on a section 1983 claim, a plaintiff must establish the following elements: (1) a violation of rights, privileges, or immunities secured by the Constitution or laws of the United States; and (2) the violation complained of was committed by a person acting under color of state law. Harvey v. Plains Twp. Police Dep't, 635 F.3d 606, 609 (3d Cir. 2011). Furthermore, "a plaintiff who wishes to sustain a [section] 1983 claim based upon a violation of procedural due process must, at a minimum, prove recklessness or 'gross negligence' and in some instance[s] may be required to show a 'deliberate decision to deprive' the plaintiff of due process." Jordan v.

43

Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1277 (3d Cir. 1994) (quoting

Daniels, 474 U.S. at 333-34).

The trial court explained its reasons for dismissing plaintiff's due process

claims as follows:

> Plaintiff's basis for the claim is that the August 2015 press release labeled him as a sex offender. A review of the press release shows that plaintiff is not labeled as a sex offender as no individual defendants are named . . . .
>
> Plaintiff asserts a violation of procedural substantive due process rights relying on O'Neill [v. Kerrigan, No. 11-3437, 2013 U.S. Dist. LEXIS 24658 (E.D. Pa. Feb. 22, 2013)]. The [c]ourt notes it's an unpublished opinion. Plaintiff did not attach a copy in violation of [Rule] 1:36.
>
> Nevertheless, the O'Neill decision discusses whether there's a privacy right associated with disclosure of juvenile records and finds there is a lack of precedent to support a finding of any such right.
>
> Plaintiff also relies on Kirby [v. Siegelman, 195 F.3d 1285, 1292 (11th Cir. 1999), and Neal v. Shimoda, 131 F.3d 818, 829 (9th Cir. 1997),] in arguing the [p]rosecutors acted maliciously. The present matter is distinguishable from both Kirby and . . . Neal as both dealt with the classification of an inmate as [a] sex offender[].
>
> Specifically, in . . . Neal due process violations were found where the inmates were labeled sex offenders prior to being convicted of the offense. It should be further noted the defendants in Neal were

44

> ultimately entitled to qualified immunity which this [c]ourt agrees is applicable to the [MCPO] defendants.
>
> As previously stated[,] there's no specific mention of plaintiff's name or specific accusation made against him of being a sex offender. There's no clearly established privacy right violated by disclosure of juvenile records and the [MCPO] defendants are entitled to qualified immunity.

The trial court's reasoning is sound. Plaintiff's second amended complaint alleged the news release stigmatized and portrayed him as a "sexual pariah," thereby causing him "specific harm by defaming him." However, damage to one's reputation does not give rise to a valid claim under section 1983. See Paul v. Davis, 424 U.S. 693, 701 (1976) (holding reputation alone is not an interest protected by Due Process Clause). Without demonstrating the deprivation of a federally protected interest, plaintiff could not assert a cognizable due process claim under section 1983. See Kelly v. Borough of Sayreville, 107 F.3d 1073, 1078 (3d Cir. 1997) ("[W]e must be careful not to equate a state defamation claim with a cause of action under section 1983 predicated on the Fourteenth Amendment."); Robb v. City of Phila., 733 F.2d 286, 294 (3d Cir. 1984) ("Stigma to reputation alone, absent some accompanying deprivation of present or future employment, is not a liberty interest protected by the [F]ourteenth [A]mendment").

Moreover, as the trial court noted, plaintiff's reliance on <u>Kirby</u> and <u>Neal</u> is misplaced. In <u>Kirby</u>, the Circuit Court determined the plaintiff's due process rights were implicated not only because he was classified and stigmatized as a sex offender without being convicted of a sex crime, but also the classification's negative consequences on his conditions of confinement. 195 F.3d at 1291-92. Here, plaintiff was neither confined nor classified as a sex offender resulting in the deprivation of any rights or liberties.

Similarly, <u>Neal</u> involved the designation of inmates as sex offenders compelling their participation in Hawaii's "Sex Offender Treatment Program" as a precondition to their eligibility for parole. 131 F.3d at 821. The Ninth Circuit held designating a prisoner as a sex offender and requiring him to complete a sex offender treatment program as a precondition to parole eligibility violated the prisoner's due process rights when the prisoner had never been convicted of a sex offense and never had an opportunity to challenge the "sex offender" label in an adversarial setting. <u>Id.</u> at 831. Unlike <u>Neal</u>, plaintiff was not classified as a sex offender or compelled to participate in a sex offender program. Moreover, the news release did not label him a sex offender or name him. Therefore, no protected liberty interests were implicated, and no privacy rights were violated by Kuberiet or Carey.

B.

Plaintiff contends the trial court erred by dismissing his FCRA claims against Kuberiet and Carey for the improper disclosure of his juvenile records because "[e]very juvenile has an expectation of privacy in their juvenile records." He asserts "[t]he litigation privilege does[ not] protect defendants from liability for FCRA claims," because he "has a procedural due process right to not hav[e] the records disclosed without first being heard by a court of law or at a minimum, seeking permission from his parents."

In J.P. v. DeSanti, juveniles filed suit to enjoin compilation and dissemination of social histories prepared by state probation authorities concerning legal proceedings involving those juveniles. 653 F.2d 1080, 1081 (6th Cir. 1981). The Sixth Circuit concluded "the Constitution does not encompass a general right to nondisclosure of private information." Id. at 1090. The court stated: "The interest . . . in nondisclosure [of juvenile court records] . . . is 'far afield' from those privacy rights that are 'fundamental' or 'implicit in the concept of ordered liberty.'" Ibid. See also McCrary v. Jetter, 665 F. Supp. 182, 186 (E.D.N.Y. 1987) (holding plaintiff did not have constitutionally protected interest in confidentiality of his youthful offender file, explaining:

"Plaintiff's federal civil rights claim does not fall within the 'zones of privacy' recognized by the Supreme Court.").

Here, the trial court stated:

> Most of the Federal Courts have considered the issue and have found . . . considerable doubt as to whether a constitutional right to privacy extends to juvenile arrest and related records, see [United States v. T.E.S., 165 F.3d 913 (1998)], finding it doubtful that a State may create a constitutionally protected reasonable expectation of privacy in the nondisclosure of a juvenile's criminal record, . . .[see also] DeSanti, [653 F.2d at 1088-90] . . . , holding there's no constitutional right to privacy in juvenile court records as the interest in nondisclosure of such records is far afield from those privacy rights that are fundamental or implicit in the concept of ordered liberty.
>
> . . . .
>
> Here the claim for violation of procedural due process fail[s] for several reasons. First, the cited cases show there[ is] no clearly established right of privacy violated by disclosure of a juvenile record. The [c]ourt has already determined the plaintiff waived his claims related to disclosure of his records and dismissed those claims with prejudice . . . .
>
> Further, the [c]ourt will not permit the plaintiff an opportunity to amend both on the improper form and also the case law which shows amendment would be futile . . . .

The trial court correctly concluded plaintiff's claim of an FCRA violation relating to the release of his juvenile records failed as a matter of law.  Plaintiff

did not have a protected right to the nondisclosure of his juvenile records and there was no violation of a right under the Constitution or federal law. Furthermore, plaintiff's argument the MCPO defendants failed to obtain the court's permission or parental consent before disclosing his juvenile records was not a viable claim because section 1983 cannot be used to maintain actions for alleged violations of state law. Harvey, 635 F.3d at 609.

## C.

Plaintiff argues the trial court erred by dismissing his FCRA claims against Rafferty for similar reasons as the MCPO defendants. Pointing to count twenty-three of the second amended complaint, he argues "Rafferty used [p]laintiff's past juvenile adjudication on record to discriminate against [p]laintiff as a student by not allowing him to engage in . . . sports and/or other extra-curricular activities."

The trial court stated:

> The [c]ourt finds that [c]ount [twenty-three of the second amended complaint] must be dismissed because plaintiff has not pled sufficient facts to support a cause of action under [section] 1983 . . . . At oral [argument] plaintiff's counsel indicated that plaintiff's due process rights had been violated because Rafferty had failed to issue a waiver which would have permitted him to play football and plaintiff was not given the right of appeal. Defendant's counsel offered that the waiver in question had to come from Sayreville, not Piscataway.

Accepting plaintiff's argument as true, it must still fail because the [c]ourt finds that plaintiff again does not have a fundamental or constitutional right to participate in interscholastic sports. Thus, even assuming that Rafferty was acting under color of law because she was acting in her capacity as a school Superintendent[,] plaintiff has not identified any fundamental constitutional right violated by Rafferty to support a viable claim under [section] 1983.

Plaintiff alleges that Rafferty used his past juvenile record to preclude him from participating in sports in [PHS]. However, plaintiff has provided no legal precedent that states he is entitled to a privacy right in his juvenile records under the constitution.

. . . .

More importantly Rafferty would be entitled to qualified immunity from plaintiff's claims. As a state public official performing a discretionary function Rafferty would be immune from suit unless she clearly violated a statutory or constitutional right which a reasonable person should have known[.] Harlow, 457 U.S. [at] 818.

In order for plaintiff to overcome a qualified immunity defense plaintiff must prove that defendant's conduct violated plaintiff's constitutional rights and that the right was clearly established at the time of the misconduct. Plaintiff has identified no fundamental or constitutional right under the facts alleged and Rafferty would be entitled to qualified immunity had the constitutional claims not been dismissed . . . .

We affirm substantially for the reasons expressed by the trial court and in the preceding section of this opinion. We add that participation in school-sponsored extracurricular activities is not a fundamental right under the United States Constitution. Palmer v. Merluzzi, 868 F.2d 90, 96 (3d Cir. 1989); Albach v. Odle, 531 F.2d 983, 984-85 (10th Cir. 1976); Mitchell v. La. High Sch. Athletic Ass'n, 430 F.2d 1155, 1158 (5th Cir. 1970); Angstadt v. Midd-West Sch. Dist., 286 F. Supp. 2d 436, 442 (M.D. Pa. 2003), aff'd, 377 F.3d 338 (3d Cir. 2004). Because section 1983 cannot be used to maintain alleged violations of state law, the claims against Rafferty failed as a matter of law.

IV.

In point VI of his brief, plaintiff challenges the dismissal of his intentional IIED claim. He argues "[t]his tort is[ not] subject to any heightened pleading requirements and the complaint sufficiently pleads the factual predicates for the emotional infliction of emotional distress." He asserts the court erred because it "cannot make factual determinations about the severity of the emotional distress that [he] suffered or whether that distress was intentionally inflicted by defendant. At this juncture, [he] is entitled to every reasonable inference." He asserts he was entitled to discovery before the court dismissed his claim.

A-3654-18

To establish a claim for IIED, a plaintiff must show: (1) the actor intended to inflict emotional distress or the actor knew or should have known emotional distress was a likely result of his or her conduct; (2) the conduct was extreme and outrageous; (3) the actor's conduct was the proximate cause of plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was severe. Cole v. Laughrey Funeral Home, 376 N.J. Super. 135, 146-47 (App. Div. 2005).

The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Buckley v. Trenton Sav. Fund Soc., 111 N.J. 355, 366 (1988) (quoting Restatement (Second) of Torts § 46 cmt. d (Am. Law Inst. 1965)). The emotional distress must be "so severe that no reasonable man could be expected to endure it." Ibid. (quoting Restatement, § 46 cmt. j). The standard is an objective one. Turner v. Wong, 363 N.J. Super. 186, 200 (App. Div. 2003).

The severity of emotional distress is a mixed question of law and fact, and therefore the court decides whether as a matter of law such emotional distress can be found, and the jury decides whether, in fact, it has been proved. Buckley, 111 N.J. at 367. "A[] severe and disabling emotional or mental condition which is capable of being generally recognized and diagnosed by professionals trained

to do so qualifies as severe emotional distress." Hill v. N.J. Dep't of Corr., 342 N.J. Super. 273, 297 (App. Div. 2001) (citing Taylor v. Metzger, 152 N.J. 490, 515 (1998)).

In dismissing the IIED claim pled in the initial complaint, the trial court stated:

> Here plaintiff's allegations regarding the defendants did not give rise to any indication the defendants acted with any intent to cause plaintiff to suffer severe emotional distress[] or cause him harm, and failed to rise to the level of extreme and outrageous conduct.
>
> Although plaintiff claims defendants['] conduct was extreme and outrageous, no facts have been alleged that could give rise to any claim that defendants acted in an extreme and outrageous way to constitute an intentional infliction of emotional distress claim. Simply providing plaintiff's . . . [c]ounsel's certification and letters from plaintiff himself, and plaintiff's mother fails to establish any entitlement to emotional distress damages.

Dismissing the IIED claim pled against Rafferty in the second amended complaint, the court stated:

> Giving plaintiff's complaint its most expansive reading, plaintiff has failed to plead any facts which might reasonably support a claim for intentional infliction of emotional distress. Plaintiff does not cite any conduct that shows Rafferty acted with any intent to cause him to suffer harm or severe emotional distress.

To the contrary, Rafferty made the decision to preclude plaintiff from participating in activities . . . [for] several reasons, among them concern that other students would be harmed if the school were to lose its NJSIAA eligibility by permitting [plaintiff] as a juvenile adjudged to be delinquent to participate in the program.

The [c]ourt also notes that . . . although the complaint speaks in general terms of "outrageous behavior" there's no identification of anything beyond the fact[] that Rafferty was acting in her capacity as superintendent.  It was her job to make a decision whether or not to permit plaintiff to enroll in school, which she did permit.

It was within her role as Superintendent to decide whether or not he should be permitted to participate in interscholastic sports.  She made the decision and proffered at least one reasonable basis for the decision . . . .

Accepting those facts as true, . . . there is nothing there from which a reasonable person might conclude that what Rafferty did was shocking, that it was not something that would occur in the daily lives [of] people or that the conduct was extreme or outrageous.

The trial court correctly found the conduct alleged by plaintiff did not set forth a cause of action for IIED because it lacked any indicia of being outrageous and extreme.  Moreover, plaintiff did not allege a medical or psychological diagnosis or he received treatment as a result of the conduct alleged in his pleadings.

54

We reject plaintiff's contention he should have been afforded discovery prior to the dismissal of this claim. "It has long been established that pleadings reciting mere conclusions without facts and reliance on subsequent discovery do not justify a lawsuit." Glass v. Suburban Restoration Co., Inc., 317 N.J. Super. 574, 582 (App. Div. 1998). Because plaintiff's claim was precluded as a matter of law, discovery would be futile as the facts relating to his physical and psychological conditions were known to him prior to the commencement of his suit and not pled.

V.

In point VII, plaintiff challenges the dismissal of his civil conspiracy claim. Similar to the IIED claim, he asserts he should be afforded discovery "to further develop the claims which are suggested by the facts and pled in the complaint."

Our law defines a civil conspiracy as

> a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.
>
> [Banco Popular, 184 N.J. at 177 (quoting Morgan v. Union Cnty. Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993)).]

Civil conspiracy is not an independent cause of action, but rather a "liability expanding mechanism" which exists only if a plaintiff can prove the underlying "independent wrong." Farris v. Cnty. of Camden, 61 F. Supp. 2d 307, 326 (D.N.J. 1999). "The gist of an action in civil conspiracy is not the conspiracy itself but the underlying wrong, which absent the conspiracy, would give a right of action." Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank, 163 N.J. Super. 463, 491 (App. Div. 1978). "The essential element of the tort is not the conspiracy[,] but the damage inflicted pursuant to it." Ibid.

The trial court dismissed plaintiff's civil conspiracy count against the MCPO defendants in the first amended complaint, finding it was "devoid of any facts to suggest the defendants conspired to cause plaintiff harm," and "any underlying wrongs [were] additionally barred because of the immunity bestowed upon the public entity defendants." Because plaintiff's complaint failed to state a claim, the court likewise found it could be dismissed prior to obtaining discovery. The court dismissed the civil conspiracy count against Rafferty in the second amended complaint, for similar reasons, finding plaintiff had

> not sufficiently pled the requisite underlying act to hold
> Rafferty liable . . . .  In order for [Rafferty] to be held

liable for civil conspiracy there must be an underlying unlawful act.

. . . [P]laintiff's claims have been withdrawn or dismissed . . . and as a result there is no predicate act and no underlying activity that can form the basis for the civil conspiracy.

The trial court did not err. Plaintiff's complaint alleged "[d]efendants entered into a real agreement" to "perpetrate a tort against [him]" and "[d]efendants . . . acted together and in concert to deprive [him of] his civil rights." However, plaintiff failed to plead any facts identifying the nature of the agreement between defendants giving rise to a conspiracy, when the conspiracy occurred, or how it was accomplished. "Complaints cannot survive a motion to dismiss where the claims are conclusory or vague and unsupported by particular overt acts." Delbridge v. Off. of Pub. Def., 238 N.J. Super. 288, 314 (Law Div. 1989), aff'd o.b. sub nom., A.D. v. Franco, 297 N.J. Super. 1 (App. Div. 1993), certif. denied, 135 N.J. 467, cert. denied, 513 U.S. 832 (1994).

Because plaintiff failed to establish defendants violated any of his substantive rights under the NJCRA or FCRA, there was no underlying wrong to support the civil conspiracy claim. Furthermore, as we noted, immunity and the litigation privilege applied to the respective defendants, which also prevented a finding of an underlying wrong. As with the IIED claim, dismissal

did not have to await the completion of discovery where plaintiff failed to sufficiently plead facts showing a civil conspiracy.

VI.

In point VIII, plaintiff challenges the trial court's dismissal of his defamation claim against Kuberiet and Carey. He argues he pled viable defamation claims and was entitled to discovery prior to dismissal of the claims. He asserts discovery was necessary to determine whether the MCPO defendants were entitled to "qualified privilege . . . and even then, whether a defendant abused that privilege is an issue reserved for the jury."

"A defamatory statement is one that is false and 'injurious to the reputation of another' or exposes another person to 'hatred, contempt or ridicule' or subjects another person to 'a loss of the good will and confidence' in which he or she is held by others." Romaine v. Kallinger, 109 N.J. 282, 289 (1988) (quoting Leers v. Green, 24 N.J. 239, 251 (1957)). See also Salzano v. N. Jersey Media Grp., Inc., 201 N.J. 500, 512 (2010) ("A defamatory statement is one that is false and harms the reputation of another such that it lowers the defamed person in the estimation of the community or deters third parties from dealing with that person."). "The law of defamation is rooted in the notion that individuals should

be free to enjoy their reputations unimpaired by false and defamatory attacks." Salzano, 201 N.J. at 505.

The elements of a cause of action for defamation are: (1) defendant "made a false and defamatory statement concerning" plaintiff; (2) "the statement was communicated to another person (and not privileged);" and (3) defendant "acted negligently or with actual malice." G.D. v. Kenny, 205 N.J. 275, 292-93 (2011). "[T]he actual naming of plaintiff is not a necessary element in an action for libel. It is enough that there is such reference to him that those who read or hear the libel reasonably understand the plaintiff to be the person intended." Dijkstra v. Westerink, 168 N.J. Super. 128, 133 (App. Div. 1979).

"In the case of a complaint charging defamation, plaintiff must plead facts sufficient to identify the defamatory words, their utterer and the fact of their publication. A vague conclusory allegation is not enough." Zoneraich v. Overlook Hosp., 212 N.J. Super. 83, 101 (App. Div. 1986). Truth "is an absolute defense to a claim of defamation." G.D. v. Kenny, 411 N.J. Super. 176, 187 (App. Div. 2009).

"The threshold issue in any defamation case is whether the statement at issue is reasonably susceptible of a defamatory meaning," which is a question of law "to be decided first by the court." Romaine, 109 N.J. at 290. "In making

59

this determination, the court must evaluate the language in question 'according to the fair and natural meaning which will be given it by reasonable persons of ordinary intelligence.'"  Ibid. (quoting Herrmann v. Newark Morning Ledger Co., 48 N.J. Super. 420, 431 (App. Div.), aff'd on rehearing, 49 N.J. Super. 551 (App. Div. 1958)).  "If a published statement is susceptible of one meaning only, and that meaning is defamatory, the statement is libelous as a matter of law."  Ibid.  "Conversely, if the statement is susceptible of only a non-defamatory meaning, it cannot be considered libelous, justifying dismissal of the action."  Ibid.

In dismissing without prejudice the defamation claims in the first amended complaint, the trial court stated:

> Here, plaintiff contends that, "On or about August 31[], 2015[,] defendants defamed plaintiff by publishing written statements about plaintiff and his case with malice and forethought that were either false, reckless or misleading."
>
> And, "On or about October of 2014 and thereafter defendants defamed plaintiff by uttering and/or publishing statements about plaintiff in this case with malice of forethought that were either false, reckless or misleading."
>
> . . . .
>
> . . . [T]he Court is satisfied that blanket allegations that defendants spoke and published

60

defamatory statements about the plaintiff failed to identify any such statements or provide the context for such statements, and how if at all they defamed the plaintiff's character.

Without properly identifying a slanderous or libelous statement the plaintiff is unable to sustain a claim for liable and slander.

Moreover, the attempt to distinguish between public and private defamation is essentially meritless, as plaintiff has failed to properly identify the libelous writings or slanderous statements made by the defendants, or even if any of the statements actually identified him by name.

. . . .

Additionally[,] plaintiff claims . . . that the [MCPO] defendants issued a defamatory press release about the case in that it misled the public into thinking criminal restraint, of which plaintiff was found not guilty, was a sexually based crime.

What plaintiff fails to acknowledge, however, is that, "[While] criminal restraint does not in and of itself contain a sexual element, [it] is included under Megan's Law definition of sex offenses when committed against minors." See N.J.S.A. 2C:7-2.

. . . .

Moreover, while it may not be expressly required that the defendants specifically name the plaintiff, the [court] finds it important to note there's no allegation that any of the defendants ever released plaintiff's name to the public.

Therefore, because the claim lacks any allegations defendants specifically published any written or oral statements that were libelous or slanderous the libel and slander claims are dismissed without prejudice.

When the court dismissed the defamation claims in the second amended complaint, it stated:

Here, the [c]ourt again finds no viable cause of action for defamation against the [MCPO] defendants by application of the law of the case doctrine . . . .

. . . .

While plaintiff is correct in contending the application of the law of the case doctrine is discretionary, the [c]ourt finds this application is necessary here. A claim for defamation against the [MCPO] defendants centers on the August 31 press release. A review of the first and second amended complaints show the claim is based on the same set of operative facts. Plaintiff offers no additional facts in support of the claim and the [c]ourt has already determined that the defamation claims based on the press release are barred.

Further, a review of the press release fails to show any specific reference to the plaintiff by name and the [c]ourt cannot agree the statements made constitute defamation per se.

On appeal, plaintiff identifies seven statements from the news release he claims are defamatory. We enumerate them as follows: (1) "[S]ix of seven teenagers [were] charged with sexually assaulting and/or abusing four other

A-3654-18

teammates at [SHS;]" (2) "As was previously disclosed, the [MCPO] determined that the defendants would not be tried as adults and that the Middlesex County Family Court remains the proper venue for these cases[;]" (3) "The facts that were alleged by the [MCPO] at the beginning of the case have clearly been proven in a court of law[;]" (4) MCPO "did not pursue imposition of mandatory sex offender registration required under Megan's law[;]" (5) "The other juvenile tried in Family Court was found delinquent on a disorderly persons simple assault charge, and a petty disorderly persons count of engaging in disorderly conduct for his role in the hazing and sexual conduct[;]" (6) "[T]he investigation determined they each played roles in the attacks upon their fellow teammates in four separate incidents at the high school[;]" and (7) "One defendant held the victim, while at least two of the defendants grabbed his penis and attempted to digitally penetrate his anus. Two to five other students, who could not be identified by the victim, surrounded him during the sexual assault."

We address these statements in turn. Statement 1 was not defamatory because it was not false; plaintiff was charged with, among other things, conspiracy to commit aggravated criminal sexual conduct, criminal sexual contact, aggravated assault, hazing, riot, and criminal restraint. The news release's usage of the phrase "sexual assault" was not defamatory because "[t]he

law of defamation overlooks minor inaccuracies, focusing instead on 'substantial truth.'" G.D., 205 N.J. at 294 (quoting Masson v. New Yorker Mag., Inc., 501 U.S. 496, 516 (1991)). "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." Ibid. (internal quotation marks omitted) (quoting Masson, 501 U.S. at 517).

Furthermore, the statement referred to other defendants and could not reasonably be construed to suggest plaintiff was involved in all four incidents referenced in the release. Indeed, the release made clear the juveniles who were tried, including plaintiff, were involved in only one of the referenced incidents.

Plaintiff claims statement 2 is defamatory because he was never subject to waiver to adult criminal court. Whether plaintiff was subject to waiver was a minor inaccuracy and did not constitute defamation. Moreover, the balance of the statement was true because the Middlesex County Family Court was the proper venue for the case.

Plaintiff claims statement 3 was false and therefore defamatory because the MCPO never proved its case against him as he was acquitted of the original charges and only adjudicated delinquent on lesser included offenses. However, the statement does not claim all the charges filed against all the juveniles were proven, but rather the facts alleged were proven. The statement was not false

because it was supported by the guilty pleas and the delinquency adjudications of the various juvenile defendants. The news release's reference to the "other juvenile" who went to trial, namely, plaintiff, clearly stated he was found delinquent on a disorderly persons simple assault charge and a petty disorderly persons count of engaging in disorderly conduct. Therefore, the statement was neither false nor constituted defamation.

Plaintiff contends statement 4 is "knowingly, willfully and maliciously false" because he was never eligible for registration as a sex offender. However, plaintiff's argument ignores the entirety of the statement, which read as follows: "As part of the plea agreements, the [MCPO] did not pursue the imposition of mandatory sex offender registration required under Megan's Law." (Emphasis added). This statement is true. Moreover, the statement does not refer to plaintiff and is inapplicable to him because he did not enter a guilty plea.

Plaintiff claims statement 5 is defamatory because he was acquitted of hazing and the charges related to sexual conduct. This statement is not false because he was adjudicated delinquent of the disorderly persons offenses of simple assault and disorderly conduct for his role in the locker room incident. His acquittal of the hazing and sexual conduct did not negate his involvement in the incident.

Plaintiff contends statement 6 is false because he "did not play a role in four separate incidents" and "did not attack any of his fellow teammates." However, plaintiff reads the statement out of context. Read in its entirety, statement 6 states: "The seven juvenile defendants were taken into custody in October 2014, after the investigation determined they each played roles in the attacks upon their fellow teammates in four separate incidents at the high school between September 19, 2014 and September 30, 2014." A thorough reading of the statement shows it intended to convey each juvenile played a role in several incidents—not each juvenile was involved in every incident. Indeed, the release discussed each of the four incidents separately and ascribed only one of the four incidents to plaintiff. Contrary to plaintiff's contention, use of the word "attack" was not defamatory and reasonably described the underlying incidents.

The trial court did not specifically address statement 7 in its decision. Plaintiff contends this statement is "knowingly, willfully and maliciously false" because neither he nor any of the other juvenile defendants "were ever charged with grabbing the victim's penis," nor were they "ever found delinquent of grabbing the victim's penis or attempting to digitally penetrate his anus."

In context, the statement reads as follows:

> The first incident occurred on September 19, 2014, when a [seventeen]-year-old juvenile defendant

A-3654-18

"body slammed" a [fifteen]-year-old victim to the floor and pretended to stomp and kick the victim, exposing him to bodily injury.

On September 26, 2014, the same [seventeen]-year-old defendant, along with the two who were adjudicated delinquent following the trial, and another [sixteen]-year-old male who is awaiting trial, took part in an attack of a [fourteen]-year-old boy.

The victim also was forcibly knocked to the floor. One defendant held the victim while at least two of the defendants grabbed his penis and attempted to digitally penetrate his anus. Two to five other students, who could not be identified by the victim, surrounded him during the sexual assault.

None of the juveniles were charged, pled, or adjudicated with grabbing the victim's penis or attempting to digitally penetrate his anus. However, as the sole juvenile tried and adjudicated, the news release, without naming plaintiff, identifies him as participating in grabbing the victim's genitals and attempting to anally penetrate him. The news release made sufficient references to plaintiff such that anyone who read or heard the statement could reasonably understand the release referred to plaintiff. Dijkstra, 168 N.J. Super. at 133.

Therefore, this aspect of plaintiff's defamation claim was pled with enough sufficiency to survive a motion to dismiss pursuant to Rule 4:6-2(e) because statement 7 included accusations of serious criminal activity and sexual misconduct, which plaintiff alleges did not occur and the MCPO defendants

knew did not occur, yet asserted in the news release. For these reasons, dismissal of this aspect of the defamation claim is reversed and remanded for further proceedings. We hasten to add our decision should not be construed as an opinion on the ultimate merits of plaintiff's claim.

## VII.

Finally, in point IX plaintiff contends the court erred by transferring venue from Middlesex to Monmouth Vicinage and denying his request for reconsideration of the transfer decision. He asserts the trial court failed to find an actual conflict of interest, and an appearance of impropriety is not a basis to transfer venue under Rule 4:3-2(a). He argues the matter should not have been transferred because the cause of action arose from, and all defendants are located, in Middlesex County, and the court should have deferred to his choice of venue.

Judges must avoid actual conflicts of interest as well as the appearance of impropriety in order "to promote confidence in the integrity and impartiality of the Judiciary." DeNike v. Cupo, 196 N.J. 502, 507 (2008). Rule 4:3-2 provides venue "shall be laid in the county in which the cause of action arose, or in which any party to the action resides at the time of its commencement, or in which the summons was served on a nonresident defendant." Rule 4:3-3(a)(2) states the

Assignment Judge may order a change of venue "if there is a substantial doubt that a fair and impartial trial can be had in the county where venue is laid." Decisions relating to a change in venue "will not be disturbed on appeal except upon a showing of an abuse of discretion." State v. Harris, 282 N.J. Super. 409, 413 (1995) (citing State v. Marshall, 123 N.J. 1, 76 (1991)).

The March 28, 2017 order transferring venue to Monmouth County noted it was made "having considered . . . [Rule] 4:3-3(a) and . . . [to] avoid all appearances of any perceived conflict . . . ." On reconsideration, the Assignment Judge explained he denied plaintiff's motion because the

> Middlesex County Prosecutor's Office appears before [Middlesex Vicinage] judges on a regular basis and in the interest of eliminating any appearance of impropriety, this [c]ourt felt it was necessary to transfer venue from Middlesex County to a sister vicinage . . . .
>
> . . . .
>
> . . . And if the judge is in . . . civil today, [they] could be in criminal tomorrow. Again, it's those appearances with which the [c]ourt is concerned.

We discern no error either in the initial decision to transfer venue or in the denial of reconsideration. Plaintiff's argument lacks sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, and reversed and remanded in part.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION